1          IN THE UNITED STATES MAGISTRATE COURT

2          FOR THE SOUTHERN DISTRICT OF TEXAS

3                   HOUSTON DIVISION

4   UNITED STATES OF AMERICA        §       CASE NO.: H-09-00140-M
                                    §
5   VERSUS                          §       HOUSTON, TEXAS
                                    §       FEBRUARY 27, 2009
6   LAURA PENDERGEST-HOLT           §       10:33 A.M. TO 2:30 P.M.

7
                   INITIAL APPEARANCE / BOND HEARING
8

9              BEFORE THE HONORABLE MARY MALLOY
                 UNITED STATES MAGISTRATE JUDGE
10

11
                        APPEARANCES:
12
              FOR PLAINTIFF:      SEE NEXT PAGE
13
              FOR DEFENDANT:      SEE NEXT PAGE
14
              COURT RECORDER:     SUZANNE GUEVARA
15
              CASE MANAGER:       CATHY MCBROOM
16

17

18

19
                        PREPARED BY:
20
              JUDICIAL TRANSCRIBERS OF TEXAS, INC.
21                      P.O. Box 925675
                   Houston, Texas 77292-5675
22          Tel: 713-697-4718 ▼ Fax: 713-697-4722
                   www.judicialtranscribers.com
23

24      Proceedings recorded by electronic sound recording;
           transcript produced by transcription service.
25

1                        <u>**APPEARANCES:**</u>

2

3

    **FOR THE GOVERNMENT:**              **PAUL PELLETIER**
4                                       **U.S. ATTORNEY'S OFFICE**
                                        **PO BOX 61129**
5                                       **HOUSTON, TEXAS   77208**
                                        **713-567-9736**
6

7   **FOR THE DEFENDANT:**              **DAN LAMAR COGDELL**
                                        **JAMES M. ARDOIN, III**
8                                       **COGDELL LAW FIRM**
                                        **402 MAIN STREET**
9                                       **2ND FLOOR**
                                        **HOUSTON, TEXAS   77002**
10                                      **713-426-2244**

11

                                        **CHRIS FLOOD**
12                                      **FLOOD & FLOOD**
                                        **914 PRESTON, SUITE 800**
13                                      **HOUSTON, TEXAS   77002-1832**
                                        **713-223-8877**
14

15

16

17

18

19

20

21

22

23

24

25

1                        INDEX

2

3   WITNESS:                    Direct   Cross   Redirect   Recross

4   AGENT VANESSA WALTHER:

5       By Mr. Pelletier:        19                68
                                                   83
6

7       By Mr. Cogdell:                   36                  80

8

9

10  Exhibit                          Offered       Received

11  GOVERNMENT'S EXHIBITS:
        Number 1:                       75            75
12      Number 2:                       74            75
        Number 3:                       77            77
13

14  DEFENDANT'S EXHIBITS:
        Numbers 1 and 2:                44            44
15      Numbers 3 and 4:                67            67

16

17

18

19

20

21

22

23

24

25

1      **HOUSTON, TEXAS; FRIDAY, FEBRUARY 27, 2009; 10:33 A.M.**

2          **THE COURT:**  In the matter of

3  *Laura Pendergest-Holt.*

4          **MR. COGDELL:**  Good morning, Your Honor.

5          **THE COURT:**  Good morning.

6              Mr. Cogdell, you're representing Ms. Holt?

7          **MR. COGDELL:**  I am along with Mr. Flood, yes,

8  ma'am.

9          **THE COURT:**  With Mr. Flood?

10          **MR. COGDELL:**  We just got this.

11              Could you give us a few minutes?

12          **THE COURT:**  All right, fine.  I thought you all

13  were anxious to get out of here, so fine with me.

14          **MR. COGDELL:**  Well, we're -- always a pleasure to

15  see you but let us talk first.

16          **THE COURT:**  Oh, yeah, well --

17          **(Recess taken from 10:33 a.m. to 10:45 a.m.)**

18                          **AFTER RECESS**

19          **THE COURT:**  All right.  Who's representing the

20  Government in regard to Laura Pendergest-Holt?

21          **MR. PELLETIER:**  Your Honor, Paul Pelletier on

22  behalf of the United States.

23          **THE COURT:**  Pelletier?

24          **MR. PELLETIER:**  Pelletier.  Pelletier, Pelletier,

25  your pleasure.

1          **THE COURT:**  Are you from Dallas?

2          **MR. PELLETIER:**  I am not.  I am from --

3          **THE COURT:**  Well, that was emphatic.

4          **MR. COGDELL:**  Maine justice sniper, Your Honor.

5          **THE COURT:**  Oh, okay.

6          **MR. PELLETIER:**  Massachusetts is where we are.

7          **THE COURT:**  All right.  But really, how do you

8  pronounce it?

9          **MR. PELLETIER:**  Pelletier is fine.

10          **THE COURT:**  Pelletier, okay.

11              Are there any -- are you going to waive

12  probable cause?

13          **MR. COGDELL:**  We will.

14          **THE COURT:**  You going to waive identity?

15          **MR. COGDELL:**  We'll waive identity.

16              We do have an issue on bond.

17          **THE COURT:**  All right.

18          **MR. COGDELL:**  We're fine with what Pretrial

19  recommends.  The Government is not.

20          **THE COURT:**  All right.  Is the Government moving

21  for detention?

22          **MR. PELLETIER:**  We are not, Your Honor.

23          **THE COURT:**  All right.

24          **MR. PELLETIER:**  But we are moving for a

25  substantial surety bond.

1        **(Pause)**

2              **MR. COGDELL:**  To be clear, Judge, I'm not waiving

3    the preliminary examination if they don't agree to bond.  So

4    I'm assuming they're going to put on testimony and I'm happy

5    to address or cross their testimony and present some of

6    mine.

7              **THE COURT:**  Well, you either waive it or you

8    don't, Mr. Cogdell.

9              **MR. COGDELL:**  I don't.

10             **THE COURT:**  All right.  But do you want it here

11   or in Dallas?

12             **MR. COGDELL:**  I want it here.

13             **THE COURT:**  Well, then we'll set it what, Monday?

14             **MR. COGDELL:**  We can't go forward today?

15        **(Clerk confers with the Court)**

16             **THE COURT:**  Do you have witnesses today?

17             **MR. COGDELL:**  We do.  I assume the federal agent.

18             **THE COURT:**  Well, you don't need witnesses on a

19   probable cause hearing --

20             **MR. COGDELL:**  True, but I --

21             **THE COURT:**  -- unless there's -- unless you want

22   to switch the burden which I'm sure they'd be happy.

23             **MR. COGDELL:**  No, no, I thought they were going

24   to go forward with testimony concerning the bond that they

25   are seeking.  Perhaps I was assuming incorrectly but --

1          **THE COURT:**  I'm talking about just the probable

2    cause hearing.  I mean, you either waive it or you don't.  I

3    don't care.

4          **(Court confers with the clerk)**

5          **MR. COGDELL:**  That's fine.  Assuming that we are

6    going to get the facts -- or facts in circumstances on the

7    bond hearing testimony, then we'll waive the probable cause.

8                    Make sense?

9          **THE COURT:**  No, you either waive it or you don't.

10   It's not conditional.

11          **MR. COGDELL:**  Okay.  We'll waive probable cause.

12          **THE COURT:**  All right.  Well, it's up to

13   Ms. Holt and you need to talk to her.

14          **MR. COGDELL:**  Yes, ma'am.

15          **THE COURT:**  There is a form that waives probable

16   cause and identity because this is a Rule 5 case.

17          **MR. COGDELL:**  Yes, ma'am.

18          **THE COURT:**  All right?

19          **MR. COGDELL:**  You did.  It's being filled out.  I

20   was waiting for Ms. Holt to be brought in.

21          **(Pause/voices off the record)**

22          **THE COURT:**  All right.  In the matter of

23   *United States of America versus Laura Pendergest-Holt*.

24                    Would you come forward please, Ms. Holt?

25          **THE DEFENDANT:**  Yes.

1              **THE COURT:**  Please tell me your full name for the

2  record, ma'am?

3              **THE DEFENDANT:**  Laura Pendergest-Holt.

4              **THE COURT:**  And, Ms. Holt, have you hired

5  Mr. Cogdell to represent you in this matter?

6              **THE DEFENDANT:**  Yes, I have.

7              **THE COURT:**  All right.  And, Mr. Pelletier,

8  you're representing the United States?

9              **MR. PELLETIER:**  Yes, Your Honor.  Paul Pelletier

10  on behalf of the United States.

11              **THE COURT:**  All right.  Is it Pendergest-Holt or

12  how do you prefer --

13              **THE DEFENDANT:**  It's just Holt.

14              **THE COURT:**  It's Ms. Holt.  All right.

15                Ms. Holt, did you receive a copy of this

16  criminal complaint that was filed in this matter?  There's a

17  copy of it if you need it.

18              **THE DEFENDANT:**  Yes.

19              **MR. SPEAKER:**  The copy of it you received

20  yesterday.

21              **THE DEFENDANT:**  Yes.  Yes, I have it.

22              **THE COURT:**  How old are you, Ms. Holt?

23              **THE DEFENDANT:**  Thirty-five.

24              **THE COURT:**  And how much education have you had?

25              **THE DEFENDANT:**  I have a Masters.

1           **THE COURT:**  All right.  So you don't have any

2   difficulty in reading or writing in English?

3           **THE DEFENDANT:**  No.  No, I don't.

4           **THE COURT:**  Mr. Cogdell indicates that you

5   received a copy of this criminal complaint yesterday; is

6   that correct?

7           **THE DEFENDANT:**  That's correct.

8           **THE COURT:**  Do you understand that this criminal

9   complaint is pending in the Northern District of Texas, the

10  Dallas division?  For that reason, the accusations will

11  probably be resolved in Dallas for all practical purposes

12  either by a plea of guilty or a trial or a dismissal.

13               Is that clear to you?

14          **THE DEFENDANT:**  Yes.

15          **THE COURT:**  You were arrested here --

16          **THE DEFENDANT:**  Yes, ma'am.

17          **THE COURT:**  -- because the authorities here for

18  some reason believe that you are the Laura Pendergest-Holt

19  that's named in this criminal complaint.

20          **THE DEFENDANT:**  Yes.

21          **THE COURT:**  You have the right to make the

22  authorities here in Houston link you to these accusations

23  before you can be ordered to go to Dallas to answer the

24  charge.

25               Is that clear?

1      THE DEFENDANT:  Yes, ma'am.

2      THE COURT:  So for these purposes -- I don't know

3  whether you're the Laura Pendergest-Holt or not that's

4  wanted in this case -- you have a right to make the

5  Government lawyers prove it.

6      THE DEFENDANT:  Okay.

7      THE COURT:  You have the right to remain silent.

8  You don't have to say anything in regard to this criminal

9  complaint or even as to your identification.

10      Please remember that if you choose not to

11  remain silent that instead of that you volunteer information

12  or give explanations or make any statements at all in

13  connection with this case, your own words could be used

14  against you at the trial.  You would be giving evidence

15  against yourself in that way which you do not have to do.

16  The lawyers for the Government have made the accusations.

17  They need to prove the accusation beyond a reasonable doubt.

18      Is that clear?

19      THE DEFENDANT:  Yes, ma'am.

20      THE COURT:  All right.  You have the right to

21  have a lawyer represent you not only here in Houston, for

22  the limited purposes of the hearings that you're entitled to

23  here in Houston, but you also have a right, obviously, to

24  have a lawyer in Dallas if you are found to be the one named

25  in the criminal complaint so that you can fight these

1   accusations in that jurisdiction.

2                    Mr. Cogdell, have all the arrangements been

3   finalized for your representation of Ms. Holt here in

4   Houston?

5          **MR. COGDELL:**  Yes, ma'am.

6          **THE COURT:**  And do you intend to represent her in

7   Dallas as well?

8          **MR. COGDELL:**  I do.

9          **THE COURT:**  Okay.  Then let me just address the

10  rest of my comments to Mr. Cogdell.

11                   Mr. Cogdell, having advised Ms. Pendergest

12  that this matter is in the form of a criminal complaint, do

13  you have any -- have you had discussions with her about the

14  necessity for a probable cause hearing?

15         **MR. COGDELL:**  I have, briefly.

16                   May I confer very quickly, Your Honor?

17         **THE COURT:**  Sure.

18                   Let me just explain to you, Ms. Holt, that

19  right now the accusation is in the form of these pages --

20         **THE DEFENDANT:**  Yes, ma'am.

21         **THE COURT:**  -- just this paper that was filed by

22  the prosecutor to which was attached an investigator's

23  affidavit.  You have the right to have witnesses come before

24  a judge to convince a judge that there is probable cause to

25  believe you broke the law so that you would have to stand

1    trial.  Because this case is pending in Dallas, you have the

2    right to have that hearing, if it's necessary, either in

3    Houston or in Dallas, whichever makes most sense for you or

4    you could give up your right for that hearing entirely if

5    that makes sense for you.

6                    If you give up the hearing, I just want to

7    make certain that you're doing so voluntarily and not as a

8    result of any promise or threat on your part --

9              **THE DEFENDANT:**  Okay.  Yes, ma'am.

10             **THE COURT:**  -- or anybody's part.

11             **MR. COGDELL:**  Yes, ma'am.

12             **THE COURT:**  All right.  Mr. Cogdell, do you want

13   to talk to Ms. Holt about that matter?

14             **MR. COGDELL:**  I do, briefly, Your Honor.

15             **THE COURT:**  All right.

16        **(Pause/Counsel confers with Defendant)**

17             **MR. COGDELL:**  We're ready, Your Honor.

18             **THE COURT:**  All right.  Ms. Holt, let me -- you

19   said that you read the criminal complaint yesterday.  Let me

20   remind you that in this criminal complaint you're accused of

21   obstructing a proceeding before a U.S. agency, that is, the

22   SEC, in violation of 18, United States Code, Section 1505.

23   Those numbers are just volume and page of the law book where

24   you can look up what Congress has prohibited.

25             **THE DEFENDANT:**  Okay.

1          **THE COURT:**  Do you understand what the accusation

2    is?

3          **THE DEFENDANT:**  Yes, ma'am.

4          **THE COURT:**  Do you understand that if there's

5    probable cause to believe that you broke the law, an

6    indictment will probably be returned?   You'll have the

7    right to plead not guilty.  If there's a trial in the matter

8    or if there's a plea of guilty and you're found guilty

9    beyond a reasonable doubt, the Judge who's presiding over

10   your case will have to punish you in some way.

11         **THE DEFENDANT:**  Yes, ma'am.

12         **THE COURT:**  Mr. Pelletier, what's the range of

13   punishment to which Ms. Holt would be subject if she's found

14   guilty of this charge in the criminal complaint?

15         **MR. PELLETIER:**  A single charge of 1505,

16   Your Honor, would bring the maximum penalty of five years'

17   imprisonment.

18         **THE COURT:**  And a fine?

19         **MR. PELLETIER:**  A fine of $250,000.

20         **THE COURT:**  And supervised release?

21         **MR. PELLETIER:**  Three years.

22         **THE COURT:**  "Supervised release," Ms. Holt, means

23   that you have to live under Court rules of supervision even

24   after you are discharged from prison.

25         **THE DEFENDANT:**  Yes, ma'am.

1     **THE COURT:**  So do you understand all the

2    consequences of a finding of guilt in this matter?

3     **THE DEFENDANT:**  Yes, ma'am.

4     **THE COURT:**  Okay.  As to identification,

5    Mr. Cogdell, is there any need for an identification hearing

6    in regard to this case?

7     **MR. COGDELL:**  There is not.

8     **THE COURT:**  All right.  Ms. Holt, if I don't hear

9    any witnesses on the question of identification, then I'm

10   going to assume that you're the one that Dallas is looking

11   for and I'm going to order you to go there to stand trial.

12          Is that clear to you?

13     **THE DEFENDANT:**  Yes, ma'am.

14     **THE COURT:**  Okay.  Please understand that if you

15   give up your right to an identification hearing, all you're

16   giving up is the right to complain that the proper person

17   was sent to Dallas to face the charges.  You still have the

18   right to fight tooth and nail about whether this accusation

19   is true or not.

20          Is that clear?

21     **THE DEFENDANT:**  Yes, ma'am.

22     **THE COURT:**  All right.  Did anyone promise you

23   something so you'd give up your right to an identification

24   hearing in Houston?

25     **THE DEFENDANT:**  No, ma'am.

1          **THE COURT:**  We're you threatened in any way so

2    that you would do that?

3          **THE DEFENDANT:**  No, ma'am.

4          **THE COURT:**  Any reason, Mr. Cogdell, I shouldn't

5    accept the waiver of the identification hearing as a knowing

6    and voluntary action on Ms. Holt's part?

7          **MR. COGDELL:**  There is not, Your Honor.

8          **THE COURT:**  All right.  Then I find that you are

9    the Laura Pendergest-Holt who's wanted in connection with

10   this case in Dallas which has the number -- it doesn't have

11   a number.

12         **MR. COGDELL:**  3:09-MJ-56 is what I've got,

13   Your Honor.

14         **THE COURT:**  56?  Okay, 3:09-56.  It's the lucky

15   ones.

16      **(Laughter)**

17              Honestly.  All right.  Any question about

18   that, Ms. Holt?

19         **THE DEFENDANT:**  No, ma'am.

20         **THE COURT:**  All right.  As to the question of

21   probable cause, as I said, you have the right to have a

22   hearing on whether there's probable cause to believe that

23   you violated the law or not.  You can have that hearing in

24   Houston or in Dallas or give up your right to the hearing at

25   all.

1           Mr. Cogdell, what has Ms. Holt decided in

2    regard to the necessity for a probable cause hearing?

3           **MR. COGDELL:**  There is none, Your Honor.

4           **THE COURT:**  Ms. Holt, if I don't listen to

5    witnesses to convince me that there's a reason to believe

6    that the law was broken in this regard, then I will find

7    that there is probable cause and I will order you to go to

8    Dallas to face these charges on this criminal complaint.

9           Do you understand that?

10          **THE DEFENDANT:**  Yes, ma'am.

11          **THE COURT:**  Did anyone promise you something in

12   exchange for a waiver of the right to a probable cause

13   hearing?

14          **THE DEFENDANT:**  No, ma'am.

15          **THE COURT:**  Were you threatened in any way so

16   that you would give me that answer?

17          **THE DEFENDANT:**  No, ma'am.

18          **THE COURT:**  All right.  Mr. Cogdell, any reason

19   that I shouldn't accept the waiver for probable cause

20   hearing as a knowing and voluntary action on Ms. Holt's

21   part?

22          **MR. COGDELL:**  There is not, Your Honor.

23          **THE COURT:**  Ms. Holt, after looking at the

24   criminal complaint, the affidavit, and listening to what you

25   and your lawyer have said here this morning, I find that you

1  know that you have the right for a probable cause hearing

2  but that you're voluntarily waiving that right.

3          **THE DEFENDANT:**  Yes, ma'am.

4          **THE COURT:**  I find that there's probable cause,

5  that is, some reason to believe, that you broke the law in

6  regard to 18, United States Code, Section 1505.

7          With that finding then, you need to go to

8  Dallas to face these charges.  I anticipate that in Dallas,

9  within the next month, this case will be presented to a

10  grand jury.  If the Grand Jury believes also that there's a

11  reason to believe that the law was broken, they'll return a

12  true bill of indictment.  It'll be brought back to court so

13  you can plead not guilty to the charge and a trial date will

14  be assigned to you.

15          **THE DEFENDANT:**  Okay.

16          **THE COURT:**  Do you have any questions about

17  what's happened so far?

18          **THE DEFENDANT:**  No, ma'am.

19          **THE COURT:**  Now, Ms. Holt, in Federal Court, the

20  Judge decides whether someone should get a bond or whether

21  there's a reason that somebody should stay in jail even

22  before their trial takes place.

23          **THE DEFENDANT:**  Yes, ma'am.

24          **THE COURT:**  Mr. Pelletier, I take it that the

25  Government is not suggesting that Ms. Holt should stay in

1    jail before trial; is that correct?

2              **MR. PELLETIER:**  That is correct, Your Honor.

3              **THE COURT:**  Ms. Holt, I have before me some

4    information about you from the Pretrial Services Agency

5    including a recommendation as to your certain conditions of

6    release.

7              **THE DEFENDANT:**  Yes, ma'am.

8              **THE COURT:**  Those conditions of release are Court

9    orders that you must follow while your case is being

10   prepared for trial.

11             **THE DEFENDANT:**  Yes, ma'am.

12             **THE COURT:**  If you don't follow the Court orders,

13   your bond could be revoked and you could end up sitting in

14   custody awaiting trial in this matter.

15             **THE DEFENDANT:**  Yes, ma'am.

16             **THE COURT:**  Now, let me here you as to the

17   conditions of release.  The first condition that is

18   suggested by Pretrial is an unsecured bond.

19                   Mr. Pelletier, I take it there's some

20   disagreement in that regard?

21             **MR. PELLETIER:**  There is, Your Honor.

22             **THE COURT:**  And what is that disagreement?

23             **MR. PELLETIER:**  The disagreement is is that in

24   this case there are unique facts which establish that this

25   defendant should be held or asked to pay a bond of

AGENT VANESSA WALTHER -- DIRECT BY MR. PELLETIER                    19

1   $1 million surety or $1 million cash.

2                   As further restrictions, including

3   electronic monitoring.

4           **THE COURT:**  And why should there be $1 million in

5   cash or security?

6           **MR. PELLETIER:**  May I make my presentation?

7           **THE COURT:**  Well, let me hear from witnesses if

8   you're going to suggest that we need a million dollar bond.

9                   Do you have some witnesses?

10          **MR. PELLETIER:**  I have the FBI agent, whose name

11  is Vanessa Walther.

12          **THE COURT:**  All right.  Go ahead and have a seat.

13          **MR. COGDELL:**  Yes, ma'am.

14      **(Pause/Defendant signs document)**

15      **(Witness Sworn)**

16          **MR. PELLETIER:**  May I begin, Your Honor?

17          **THE COURT:**  Sure.

18          <u>**DIRECT EXAMINATION OF AGENT VANESSA WALTHER**</u>

19  **BY MR. PELLETIER:**

20  Q    Would you please state your name and spell your full

21  name for the record?

22  A    Yes, it's Vanessa Walther, V-a-n-e-s-s-a,

23  W-a-l-t-h-e-r.

24  Q    And how are you presently employed?

25  A    I'm a special agent with the FBI.

1  Q      And have you been assigned to investigate this matter?

2  A      Yes, sir, I have.

3  Q      And have you been investigating both fraud charges and

4  obstruction charges as it relates to Ms. Pendergest-Holt?

5  A      Yes, sir, I have.

6  Q      And I call your attention, if you would, please -- do

7  you have a copy of the affidavit and complaint before you?

8  A      I have a copy of the affidavit, yes, sir.

9  Q      I'm going to call your attention to -- by the way,

10 have you reviewed various emails as it relates to

11 Ms. Pendergest's involvement in prepping for her SEC

12 testimony?

13 A      Yes, sir, I have.

14 Q      I'm going to call your attention to Paragraph 17 of

15 the affidavit that you prepared.

16              Is this your affidavit?

17 A      Yes, sir, it is.

18 Q      All right.  And I'm going to ask you, if you could, to

19 read for the record Paragraph 17, which was an email from an

20 attorney to both Ms. Pendergest-Holt and SIB, or Stanford

21 International Bank, Affiliate President.

22 A      "On January 27th, 2009, attorney A sent an email to

23        SIB Affiliate President and Pendergest-Holt stating

24        that they should be able to provide the SEC with,

25        'Positive proof that investor funds are invested as

1        and where we say they are.  We need to account for the

2        full amount stated in the financial statements related

3        to the CDs.  For example, if we say there is

4        8.2 billion attributed to the credit default swap, we

5        have to account for the full 8.2 billion.  The SEC's

6        staff told me they are not interested in the full

7        50 or 60 billion under advisement, just the

8        8.2 billion attributable to the CDs.  You will need to

9        address all three tiers, not just Tier I and

10       Tier II.'"

11  Q     Have you reviewed the SEC testimony that is referred

12  to in Paragraph 17 of the affidavit?

13  A     Yes, I reviewed the email that was referred to in

14  Paragraph 17.

15  Q     Yeah.  And have you reviewed the SEC testimony?

16  A     Yes, sir, I have.

17  Q     And did, indeed, Ms. Pendergest-Holt in her SEC

18  testimony on February 12th -- 10th, 2009 reveal where that

19  $8.2 billion was?

20  A     No, sir.

21  Q     I'm going to show you what I will ask the Court to

22  mark as "Government's Exhibit" -- for purposes of this

23  hearing, "Exhibit 1," which is the passport -- which is a

24  copy of a passport of Ms. Pendergest-Holt.

25          **(Voices off the record)**

AGENT VANESSA WALTHER -- DIRECT BY MR. PELLETIER                    22

 1              **MR. PELLETIER:**  May I, Your Honor?

 2              **THE COURT:**  Yes, you may.

 3  **BY MR. PELLETIER:**

 4  Q     You have the original before you?

 5  A     Yes, sir.

 6  Q     Okay.  Could you tell us please where -- less than a

 7  little more than a day after this email where

 8  Ms. Pendergest-Holt traveled to, specifically on

 9  January 29th, 2009?

10  A     She traveled to Antigua and Barbuda.

11  Q     And do you have the understanding as to the

12  relationship between Antigua, Barbuda, and

13  Stanford International Bank?

14  A     Yes.  Stanford International Bank is located on the

15  Island of Antigua.

16  Q     And are there any other principals of the

17  Stanford International Bank that either reside or travel to

18  Antigua?

19  A     Yes, sir.  SIB Affiliate President resides in Antigua.

20  Q     All right.  And any other principals of

21  Stanford International Bank reside or live in Antigua?

22  A     Reside or live there?

23  Q     Yes.

24  A     Not that I'm aware of.

25  Q     Do you know who Mr. Stanford -- Robert Allen Stanford?

AGENT VANESSA WALTHER -- DIRECT BY MR. PELLETIER                    23

1   A     Yes, sir, I know who he is.

2   Q     All right.  And do you know whether or not he has a

3   residence there or a living quarters there?

4   A     Yes.  It's my understanding he does have a place to

5   stay there.

6   Q     And have you had an occasion to review the passport of

7   Mr. Davis?

8                      Who is Mr. Davis?

9   A     Mr. Davis is the CFO of Stanford Financial.

10  Q     And is that James Davis?

11  A     Yes, sir, it is.

12  Q     All right.  And have you reviewed his passport as

13  well?

14  A     Yes, sir, I have.

15  Q     And is there travel to Antigua as well in that

16  passport?

17  A     Yes, sir, there is.

18  Q     All right.  Are you aware then, also, of any anything

19  as a result of -- did you interview witnesses in this case?

20  A     Yes, sir, I did.

21  Q     Did you interview witnesses that were present at

22  a meeting in Miami during the week of February 2nd

23  through 5th, 2009?

24  A     Yes, sir.

25  Q     And were those -- did those witnesses tell you what

1  occurred at those meetings?

2  A      Yes, sir, they did.

3  Q      Was Ms. Pendergest-Holt there?

4  A      Yes.  She was president -- present beginning on

5  February 3rd.

6  Q      And could you tell the Court, generally, what was

7  discussed and what the purpose of these meetings were as

8  revealed to you by the participants?

9                    And how many participants did you speak

10  with?

11  A      I spoke with three participants.

12  Q      And could you tell the Court, please, what generally

13  the purpose of that meeting was as revealed to you by the

14  three participants?

15  A      Initially, the purpose of the meeting was to view a

16  presentation prepared by Ms. Holt and critique that

17  presentation and ask questions similar to what they thought

18  the SEC would be asking.

19  Q      And did, in fact, Ms. Holt, according to the

20  witnesses, prepare such a presentation?

21  A      Yes, she did.

22  Q      And what did that -- generally, what did that

23  presentation involve?

24  A      It involved different things involving the Stanford

25  investment model, items about the research group, the

1  different types of investments being made in Tier II of the

2  investment portfolio.

3  Q    And, ultimately, was some sort of pie chart created by

4  with -- by Ms. Pendergest-Holt?

5  A    During those meetings, yes, there was a pie chart that

6  she participated in creating that was flashed up on the

7  screen in the room.

8  Q    Okay.  And tell the -- tell us please, if you would,

9  what, in fact, that -- your understanding is of what was

10 presented in that pie chart that was presented at the

11 meetings in Miami?

12 A    The pie chart was a representation of what was held in

13 Tier III of the SIB, Stanford International Bank, portfolio.

14 Q    And did the witnesses observe Ms. Pendergest-Holt and

15 others creating this pie chart?

16 A    Yes, they did.

17 Q    And did the witnesses tell you where the information

18 was that was derived to create the information to create the

19 pie chart with respect to the Tier III investments?

20 A    Yes.  They believed it was on a thumb drive or flash

21 drive belonging to Mr. James Davis.

22 Q    And was that thumb drive or flash drive in Ms. Holt's

23 possession during the course of the presentations?

24 A    That thumb drive was in the computer on which Ms. Holt

25 was working to prepare the presentation.

1   Q     And when you say "Tier III assets," would you tell the

2   Court please what you're talking about as it relates to

3   Stanford International Bank?

4   A     The Bank apparently has three tiers of assets that

5   they hold:

6               Tier I is cash and cash equivalents;

7               Tier II is a portion of the portfolio

8   managed by 20-plus money managers around the world;

9               And then, Tier III is an unknown portion of

10  money.

11  Q     And what is the percentage of Stanford -- your

12  understanding from those presentations, from speaking with

13  the witnesses and reviewing documents in your case, what

14  was the -- represented as being the percentage of

15  Stanford International Bank's assets that were held within

16  Tier III?

17  A     Within Tier III, it was approximately 80 percent of

18  the assets.

19  Q     And that would be how much in dollars approximately?

20  Sorry to do that to you.

21  A     About $6 billion.

22  Q     And could you tell the Court please, if you would

23  please, what the reaction -- what the pie chart was meant to

24  depict or show, what it actually depicted or showed as it

25  was related to you by these three individuals?

AGENT VANESSA WALTHER -- DIRECT BY MR. PELLETIER                27

1    A      There was approximately $3.2 billion that was real

2    estate assets.  And there was $1.6 billion that was labeled

3    as "Loan to Shareholder."  The other portions of the assets

4    were various things including, I believe, some ownership

5    interests in the Washington capitals.

6    Q      So 1.6 billion was "Loan to Shareholder"?

7    A      Yes, sir.

8    Q      And who is the primary shareholder, as you

9    understood it, in -- primary or only shareholder in

10   Stanford International Bank?

11   A      The sole proprietor and shareholder is

12   Robert Allen Stanford.

13   Q      And in the other portfolio -- what you said is

14   approximately 3 billion --

15   A      Three or $3.2 billion.

16   Q      And that was listed as "Real Estate"?

17   A      "Real estate."

18   Q      All right.  And was there a further discussion that

19   was revealed to you, as it related to "real estate," that

20   real estate or equity infusions into that that was described

21   at that meeting?

22   A      There was a capital infusion into Stanford of

23   $541 million.

24             And during those meetings in Miami, it was

25   learned --

AGENT VANESSA WALTHER -- DIRECT BY MR. PELLETIER                    28

1    Q      When you say there was a capital fusion, from what are

2    you obtaining that information?

3    A      I believe it was a newsletter that Stanford

4    actually -- that Stanford Financial Group put out.

5    Q      And approximately when, if you know?

6    A      I'm thinking December, 2008.  It was late 2008.

7    Q      And what did that newsletter, to the best of your

8    recollection, state as it related to capital infusion?

9    A      That it was $541 million capital infusion.

10   Q      And was that capital infusion discussed at this

11   meeting in Miami, as represented by the three cooperating

12   witnesses?

13   A      Yes, sir, it was.

14   Q      And was Ms. Pendergest there when that was discussed?

15   A      Yes, sir, she was.

16   Q      And what was discussed about that capital infusion, if

17   you can tell us?

18   A      The capital infusion was apparently described as two

19   pieces of real estate that were already owned by the Bank.

20   Q      And was that capital infusion discussed in terms of

21   what the value of those two pieces of real estate was,

22   approximately?

23   A      Yes, sir, it was approximately 17 million for one

24   piece, and 48 million for another piece.

25   Q      So -- and whatever the math is on that, approximately

1   67 million, if I'm correct, was supposed to be the

2   representation of what the $541 billion capital --

3   $541 million capital infusion; is that what you're saying?

4   A      Yes, sir.

5   Q      All right.  And what was the reaction, as related at

6   this meeting by witnesses that were at this meeting, to that

7   announcement?

8   A      Witnesses were surprised that those two pieces of real

9   estate were considered "capital infusion" because they were

10  already owned by the Bank, and the value of that real estate

11  did not equal $541 million.

12  Q      And as it related to the $3 billion in real estate and

13  the 1.6 billion -- the revelation of that from information

14  derived from the thumb drive that was on the computer that

15  Ms. Pendergest-Holt was using, was there a reaction to that

16  information -- the 1.6 or $8 million loan to shareholder,

17  and $3 billion real estate, was there a reaction to that,

18  that was described to you --

19              THE COURT:  Whoa.

20              MR. PELLETIER:  I'm going to do that again.

21              THE COURT:  Would you please?

22              MR. PELLETIER:  I will.

23              THE COURT:  And maybe put it -- not be so leading

24  so I can hear what the witness has to say about it.

25              MR. PELLETIER:  Okay.  You described the

1    3 billion -- the pie chart which included $3 billion in real

2    estate that was depicted --

3                **THE WITNESS:**  Yes, sir.

4                **MR. PELLETIER:**  -- at the meeting in Miami.

5                **THE WITNESS:**  Yes, sir.

6                **MR. PELLETIER:**  And the $1.6 billion in loan to

7    shareholder.

8                **THE WITNESS:**  Yes.

9    **BY MR. PELLETIER:**

10   Q    Did you talk to the witnesses as to whether or not

11   they had a reaction to that?  And when I say, "The

12   witnesses," I'm talking about the three cooperating

13   witnesses that you spoke to.

14   A    Yes, sir, I did.

15   Q    And was there a reaction to that at the meeting?

16   A    Yes, sir, there was.

17   Q    And was that reaction expressed to the individuals

18   present at that meeting?

19   A    Yes, sir, it was.

20   Q    And was Ms. Pendergest-Holt at that meeting?

21   A    Yes, sir.

22   Q    And tell -- if you would, tell the Court, please, what

23   was described as the reaction if you can?

24   A    The witnesses described their feelings as being

25   shocked, feelings as if they'd been kicked in the stomach.

1   Q      And did any of them describe any reaction by

2   Ms. Pendergest-Holt that was like their reaction?

3   A      No, sir.  They said she seemed not to be surprised.

4   Q      And if you would, please, were there any statements

5   made by the witnesses as it related to what they were

6   observing in the pie chart and what they understood the

7   CD investment portfolio consisted of?

8   A      There was a statement by SIB Affiliate President that

9   the witnesses told me about.

10  Q      And what was that?

11  A      That if that were true, the Bank was insolvent and

12  that the representations made to investors by him were

13  false.

14  Q      And are you aware then that -- whether or not

15  Ms. Pendergest-Holt appeared for testimony before the SEC on

16  February 10th?

17  A      Yes, sir, she did.

18  Q      And with respect to the information you told us today

19  about her presentation of the pie chart, her possession of

20  the thumb drive which contained the information from which

21  she created the pie chart, was that revealed to the SEC in

22  the testimony?

23  A      Nothing about the meetings in Miami was revealed to

24  the SEC.

25  Q      Was she asked about preparatory meetings?

1   A      Yes, sir, she was.

2   Q      And were there subpoena duces tecum, subpoenas for

3   records, also issued by the SEC to Stanford Financial Group?

4   A      Yes, sir, there was.

5   Q      And did Ms. Pendergest or anyone before the SEC tender

6   the thumb drive that contained the information from which

7   Ms. Pendergest-Holt divined the pie chart?

8   A      No, sir.

9   Q      Are you aware of a meeting which Ms. Pendergest-Holt

10  had yesterday with the Receiver?

11  A      Yes, sir, I am.

12  Q      And have you spoken to the Receiver about that

13  meeting?

14  A      Yes, sir.

15  Q      And did Ms. Pendergest-Holt have unique access to

16  anything that she documented yesterday?

17  A      Yes, sir, she had signatory authority on accounts.

18  Q      Okay.  And did she, at the request of the Receiver

19  yesterday, sign a document with respect to a Credit Suisse

20  account?

21  A      Yes, sir, she did.

22  Q      And did Ms. Pendergest-Holt have signatory authority,

23  as you understood it from your discussions with the

24  Receiver, over that Credit Suisse account?

25  A      Yes, sir, she did.

1  Q      And approximately -- what is your understanding of

2  what the approximately balance is on that Credit Suisse

3  account?

4  A      One hundred and sixty million dollars.

5  Q      Do you know what Ms. Pendergest's salary was and bonus

6  structure was at the Stanford International Bank or

7  Stanford Financial Group during the years 2007 and 2008?

8  A      Yes, sir.

9  Q      Would you tell the Court, please, what her base pay

10 was and what her bonuses were for those years?

11 A      Her base pay in 2007 was $350,000.  Her base pay in

12 2008 was $375,000.  Her bonuses each year were over

13 $700,000.  I don't have the exact numbers in front of me.

14 Q      Is it your understanding also that

15 Ms. Pendergest-Holt -- and the reason why I'm asking this

16 is: I don't see these properties listed as "assets" in the

17 pretrial services report -- is there a property in Baldwyn,

18 Mississippi that is owned by Ms. Pendergest?

19 A      Yes, sir, there is.

20 Q      Do you have any estimation or any knowledge of any

21 value of that property?

22 A      I would have to look at our reports.  I believe it was

23 right around $200,000, maybe slightly less.

24 Q      And is it your understanding also that -- I understand

25 that the pretrial services report reflects a lot in

AGENT VANESSA WALTHER -- DIRECT BY MR. PELLETIER                     34

1   North Carolina to which Ms. Pendergest-Holt is paying

2   approximately $7500 a month in mortgage or interest

3   payments.

4               Are you also aware of a property that is

5   owned by Ms. Pendergest-Holt and/or a husband which includes

6   a residence in North Carolina, as well?

7               **MR. COGDELL:**  Objection.  Compound, Your Honor.

8               **THE COURT:**  Yeah.  Clarify that, if you would,

9   for me, Mr. Pelletier.

10              **MR. PELLETIER:**  Yeah.

11  **BY MR. PELLETIER:**

12  Q     Do you have any knowledge of the ownership structure

13  or how it was acquired?

14  A     It appears that there's two properties in

15  North Carolina:

16              One looks to be a lot, which was purchased

17  with a loan amount of $250,000;

18              And then there is a residence with a

19  purchase price of $2 million.

20  Q     Do you know approximately when that was acquired?

21  A     I believe it was 2007 but I would have to look at the

22  records again.

23  Q     And do you know what the ownership structure is for

24  that residence in Bloomington, North Carolina?

25  A     Yes.  It is Ms. Holt and her husband.

1   Q     Have you, in your investigation or in your meetings

2   with the SEC, been able to locate the $6 billion that was

3   indicated in the pie chart as part and parcel of the -- or a

4   little bit less than 6 billion -- part and parcel of

5   Tier III; have you been able to locate a single dollar of

6   those funds?

7   A     There have been funds located by the Receiver, yes.

8   Q     And do you know approximately how much the Receiver

9   has located as of this time?

10  A     Ninety million dollars, but that does not include the

11  potential 160 million at Credit Suisse.

12  Q     And have you -- you have Ms. Pendergest-Holt's

13  passport before you?

14  A     Yes, sir, I do.

15  Q     And you have her statements to Pretrial -- or she has

16  told Pretrial Services that she has traveled to Switzerland

17  and London, Mexico, Columbia, and Venezuela.

18              Are there any entries, as of 2007, that you

19  can see -- and the passport, I think, was issued in May of

20  2007 -- are there any entries into Switzerland?

21          MR. PELLETIER:  Having reviewed it, Your Honor, I

22  believe the answer is "No" but --

23          THE WITNESS:  I was going to say I don't see

24  anything to Switzerland on this passport.  No, sir, I don't

25  see anything showing a stamp with Switzerland.

1   BY MR. PELLETIER:

2   Q     Now, as it relates to Ms. Pendergest-Holt's appearance

3   at Stanford offices in Houston, yesterday --

4   A     Yes, sir.

5   Q      -- are you aware of whether or not the Receiver had

6   to do anything in particular to obtain her presence there?

7   A     He promised her an advance on her salary of $10,000.

8             MR. PELLETIER:  May I have one moment,

9   Your Honor.

10            THE COURT:  Yeah.

11            MR. PELLETIER:  Your Honor, that would be the --

12  the Government has no further questions at this time of this

13  witness.

14            THE COURT:  All right.

15            MR. COGDELL:  May I proceed, Your Honor?

16            THE COURT:  Yes, you may.

17            CROSS EXAMINATION OF AGENT VANESSA WALTHER

18  BY MR. COGDELL:

19  Q     Special Agent, may I address with how long you have

20  been a special agent for the FBI?

21  A     Since 1995.

22  Q     And in those 13 or 14 -- 14 or 15 years, whatever it

23  is, have you ever seen a stamp on a passport from

24  Switzerland?

25  A     No, sir, I haven't.

1   Q      Because they don't stamp your passport when you go to

2   Switzerland, do they?

3   A      I'm not -- I don't know that.

4   Q      Well, if they don't stamp your passport when you go to

5   Switzerland, that would probably explain why there's no

6   stamp there, correct?

7   A      Yes, sir, it would.

8   Q      How many passports, Special Agent, have you reviewed

9   in your 15 years?

10  A      A handful of passports.

11  Q      Okay.  And -- I mean, we're talking 5, 10, 20, 50, how

12  many?   A "handful" to you may be different than a handful

13  to me.

14  A      Less than a dozen.

15  Q      And in any of those, have you ever seen a Swiss stamp?

16  A      No, sir.

17  Q      This $10,000 that Counsel referred to you that they

18  had to promise Ms. Pendergest-Holt to get your -- get her

19  here to Houston, would you agree with me there was a reason

20  that the SEC agreed to give her the $10,000?

21  A      I'm sorry, would you repeat that question?

22  Q      Sure.  Would you agree with me that there was a

23  necessary reason that the SEC Receiver -- the Receiver in

24  this case, Mr. Janvey -- gave to Ms. Holt's SEC lawyer

25  $10,000?

AGENT VANESSA WALTHER -- CROSS BY MR. COGDELL                          38

1  A      I understand that she needed expenses for travel pay.

2  Q      Her money's frozen.  She doesn't have any accessible

3  funds to be playing with; agree with me on that?

4  A      Yes, sir, I believe all of her assets are frozen.

5  Q      So the only way she could get here is if the SEC

6  agreed to pay for her and they did, right?

7  A      The Receiver agreed to, yes, sir.

8  Q      Let's back up.

9             What is your definition, ma'am, of "a

10 cooperating witness"?

11             **MR. PELLETIER:**  Objection.  Relevance.

12             **THE COURT:**  What's the relevance?

13             **MR. COGDELL:**  Well, she's referred to and he's

14 referred to "Coopering Witness One, Cooperating Witness Two,

15 Cooperating Witness Three," I just want to see what in her

16 mind constitutes "a cooperating witness" because I think she

17 is a cooperating witness.

18             **MR. PELLETIER:**  Objection, Your Honor.

19             **THE COURT:**  Well, she's under a criminal

20 complaint alleging an obstruction of justice charge, so

21 let's just move on.  It doesn't really matter what the

22 witness thinks "a cooperating witness is."

23             **MR. COGDELL:**  Okay.

24 **BY MR. COGDELL:**

25 Q      Would you agree with me, Special Agent, that Ms. Holt

AGENT VANESSA WALTHER -- CROSS BY MR. COGDELL                    39

1   has met with the SEC over and over and over and over again,

2   right?

3   A      I know that she's met with them at least three times.

4   Q      Okay.  She did that voluntarily, correct?

5   A      Yes, sir.

6   Q      There was no warrant for her, right?

7   A      No, sir.

8   Q      No threats put on her, correct.

9   A      There was the pending action that the SEC has but --

10  Q      Okay.  Other than the civil action.

11  A      Yes, sir.

12  Q      And there were no threats against her.

13  A      No, sir.

14  Q      Okay.  The first time that you were aware,

15  Special Agent, that Ms. Holt met with the SEC was

16  February 10th; is that correct?

17  A      Yes, sir, that's when she had her testimony before the

18  SEC.

19  Q      And where was that?

20  A      In Fort Worth, Texas.

21  Q      Did she have a lawyer there?

22  A      There was a lawyer present, yes, sir.

23  Q      And her lawyer's name was -- what "the" lawyer's name

24  was?

25  A      Thomas Sjoblom.

1    Q      And I'm going to spell it, as it's S-j-o-b-l-o-m,

2    correct?

3    A      Yes, sir.

4    Q      And your investigation reveals that he's a former SEC

5    lawyer, right?

6    A      I believe so, yes, sir.

7    Q      He was with the SEC for a couple of -- for some

8    20 years, correct?

9    A      I don't know how long he was with the SEC.

10   Q      You believe him to be an experienced SEC lawyer,

11   right?

12   A      I can't comment on his experience, no, sir.

13   Q      Okay.  Do you know whether or not Mr. Sjoblom -- he's

14   from D.C. as far as you understand?

15   A      Yes, sir, he is.

16   Q      Do you know whether or not he's licensed to practice

17   law in the State of Texas?

18   A      No, sir, I don't know that.

19   Q      Do you know whether or not he's licensed to practice

20   law in the Southern District in Federal Court?

21   A      No, sir, I don't know that either.

22   Q      Do you know whether or not he's licensed to practice

23   in the Northern District where Fort Worth is?

24   A      No, sir, I don't know.

25   Q      Have you looked at his website or his firm's website

1   to determine whether or not he's even licensed to practice

2   law in the State or the Federal District here?

3   A     No, sir, I haven't looked at his website.

4   Q     Would it come as a surprise to you if I suggested that

5   he is not licensed to practice in the Southern District or

6   the Northern District or the State of Texas?

7           **MR. PELLETIER:**  Objection, Your Honor.

8           **THE COURT:**  Based on?

9           **MR. PELLETIER:**  Whether something is surprising

10  to her is -- I don't know who's testifying here.  Whether

11  it's surprising to her is irrelevant.

12          **THE COURT:**  True.  Sustained.

13          **MR. COGDELL:**  Okay, fair enough.

14  **BY MS. COGDELL:**

15  Q     How long was this meeting on February 10th?

16  A     I don't know the exact time, but I believe it was

17  several hours.

18  Q     And as far as you know, did Ms. Holt answer every

19  single question asked of her?

20  A     She gave an answer to every question, yes, sir.

21  Q     Okay.  Did she ever refuse to answer a question?

22  A     No, sir.

23  Q     Did she ever invoke her right to Counsel?

24  A     No, sir.

25  Q     Did she ever terminate the inquiry on that day?

1   A      No, sir.

2   Q      Were there "off the record" meetings with Ms. Holt and

3   Mr. Sjoblom with the SEC in the following days?

4   A      I'm sorry, would you repeat that?

5   Q      Were there other meetings that Ms. Holt had, where

6   Mr. Sjoblom was present, with the SEC in the days following

7   February 10?

8   A      No, sir, not that I'm aware of.

9   Q      Okay.  Now, to you knowledge, has she ever retained a

10  lawyer before; she ever been sued, if you know?

11  A      I don't know.

12  Q      Okay.  Do you know anything about any experience she

13  has, if any, in terms of lawyers?

14  A      No, sir.  Only the lawyers representing

15  Stanford Financial Group.

16  Q      Okay.  And to be clear, Mr. Sjoblom, if you read

17  the transcript, he was representing the interest of

18  Stanford Financial Group, correct?

19  A      I don't recall him stating that in the record, but I

20  do know that he did tell the Group in Miami that he

21  represented the company.

22  Q      Okay.  Now, he was hired -- Sjoblom was hired by

23  Stanford Financial Group, right, as far as you know?

24  A      As far as know, yes, sir.

25  Q      And who owns Stanford Financial Group?

1  A      Robert Allen Stanford.

2  Q      So Robert Allen Stanford is the sole owner of

3  Stanford Financial Group?

4  A      Yes, sir, he is.

5  Q      So if the funds to Mr. Sjoblom came from

6  Stanford Financial Group, in essence, they'd be coming from

7  Robert Allen Stanford, right?

8  A      I assume so, yes, sir.  And the Board of Directors.

9  Q      Okay.  I'm jumping around a bit and I apologize but

10 Stanford has been charged or arrested, correct?

11 A      Correct.

12 Q      Jim Davis has not been charged or arrested, correct?

13 A      Yes, sir.

14 Q      Mr. Stanford is reportedly a man to be worth several

15 billion?

16 A      He claims that, yes.

17 Q      Well -- so did Fortune and Forbes and a bunch of

18 different magazines, right?

19 A      Forbes did, yes.

20 Q      So that you and I are talking about the same fellow --

21        **(Pause/voices off the record)**

22                    May I approach, Your Honor?

23             **THE COURT:**  You may.

24 **BY MR. COGDELL:**

25 Q      I'm going to show you, Special Agent, what I've had

1   caused to be marked as "Defense Exhibit 1" and "2," and ask

2   you if you recognize the center individual here in the

3   Defendant's Exhibit 1 and the only individual here in

4   Defendant's Exhibit 2?

5   A    Yes, sir, I do.

6   Q    Do they appear to be a fair and accurate photograph of

7   Robert Allen Stanford who is the owner of Stanford Financial

8   Group, and Jim Davis who I guess is the Number Two man at

9   Stanford Financial Group?

10        **MR. PELLETIER:**  Your Honor, could I just take a

11  look at what he's showing this witness?

12        **THE COURT:**  Sure.

13      **(Voice off the record)**

14        **THE WITNESS:**  In Exhibit 1, yes, the center

15  individual is Robert Allen Stanford.

16  **BY MR. COGDELL:**

17  Q    And Mr. Davis?

18  A    Exhibit 2, he's much grayer than the last picture that

19  I saw but that appears to be him.

20  Q    Okay.

21        **MR. COGDELL:**  I tender Defense Exhibit 1 and 2 to

22  Counsel and offer the same into evidence, Your Honor.

23        **MR. PELLETIER:**  No objection.

24        **THE COURT:**  They'll be admitted.  Defense 1 and 2

25  will be admitted.

AGENT VANESSA WALTHER -- CROSS BY MR. COGDELL                    45

1        **(Defendant's Exhibit Numbers 1 and 2 were admitted**

2 **into evidence)**

3            **MR. COGDELL:**  How long do you want to work,

4 Judge?  I think we've got --

5            **THE COURT:**  Well, I have a meeting at noon.

6            **MR. COGDELL:**  Okay.

7            **THE COURT:**  So shut down around 10 of for sure.

8            **MR. COGDELL:**  Fine.

9        **(Pause/Courts speaks to other counsel in the**

10 **courtroom)**

11 **BY MR. COGDELL:**

12 Q    Now, at some point, are you aware that Mr. Sjoblom

13 filed what is called "a noisy withdrawal"; ever heard that

14 term before?

15 A    I've never heard that term, but I'm aware that he

16 withdrew.

17 Q    And do you know the basis of his supposed withdrawal?

18 A    No, sir, but I know generally what he stated in his

19 withdrawal.

20 Q    Now, he also, as far as you know, appeared in meetings

21 not only where Ms. Holt was present but Mr. Stanford was

22 present, and Mr. Davis was present, and Mauricio Alvarado

23 was present, correct?

24 A    Yes, sir.

25 Q    And for the record, Mauricio Alvarado is the general

AGENT VANESSA WALTHER -- CROSS BY MR. COGDELL                    46

1  counsel to Stanford Financial?

2  A     Yes, sir, he is.

3  Q     And in terms of the complaint, is Mauricio Alvarado --

4  is he the Cooperating Witness Number One?

5            MR. PELLETIER:  Objection, Your Honor.

6            THE COURT:  Sustained.

7            MR. COGDELL:  Okay.

8  BY MR. COGDELL:

9  Q     Is he described at all in the complaint, Alvarado?

10  A     Yes, sir, he is.

11  Q     Okay.  Now, in terms of their wealth, would you agree

12  with me that, by far and away, Stanford is purportedly the

13  wealthiest fellow there at Stanford Financial?

14  A     I would say that Mr. Davis, Mr. Stanford, and Ms. Holt

15  are the ones who had access to the most money, yes.

16  Q     Okay.  I'll try again.

17            In terms of their wealth -- not asking

18  you -- we'll get there, but I'm not asking you about access

19  to funds.  I'm talking to you now, ma'am, in terms of their

20  personal wealth.

21            Who was the wealthiest?

22            MR. PELLETIER:  Objection, Your Honor.

23            Could we define what he means by "personal

24  wealth"?

25            MR. COGDELL:  What he is purportedly worth.

1            **THE WITNESS:**  I know what Forbes Magazine --

2            **MR. COGDELL:**  Okay.  What did that say?

3            **THE WITNESS:**  -- reported that he was worth.

4    **BY MR. COGDELL:**

5    Q     I stepped on you, I apologize.

6                What did Forbes put him at?

7    A     I believe it was 2.2 billion, right around 2 billion.

8    Q     And Mr. Davis, do you have an estimate, Special Agent,

9    as to his worth, what he is worth?

10   A     No, sir, I don't.

11   Q     Would you agree with me it would likely be in the tens

12   of millions of dollars?

13   A     He appears to have significant wealth.

14   Q     Okay.  Again, "significant wealth," we're talking

15   millions and millions and millions.

16           **MR. PELLETIER:**  Objection, Your Honor.

17           **THE COURT:**  Well, that'd be overruled.  She's

18   answered it sufficiently, Mr. Cogdell.

19   **BY MR. COGDELL:**

20   Q     Okay.  You talked about Ms. Holt's annual salary; can

21   you favor us, ma'am, with the approximate annual salary of

22   Robert Allen Stanford?

23   A     No, sir, I don't know that.

24   Q     Would you agree with me that Mr. Stanford has

25   ostensively homes all over the world?

AGENT VANESSA WALTHER -- CROSS BY MR. COGDELL                    48

1    A      Yes, sir, he does.

2    Q      Castles?

3    A      One of his residences was described as that.

4    Q      He's got at least two G-4 aircraft?

5    A      Yes, he has aircraft.

6    Q      And a G-4 aircraft, to the aircraft uninitiated,

7    that's a large plane worth tens of millions of dollars.

8    A      Yes, sir.

9    Q      He has not one of those but two of those, right?

10   A      I'm not sure of the exact number, but he has more than

11   one aircraft.

12   Q      Okay.  And he has other airplanes as well, Hawkers and

13   Expresses, substantial holdings in aircraft, right?

14   A      Yes, sir.

15   Q      He has houses in Antigua?

16   A      Yes, sir.

17   Q      He has houses where else?

18   A      St. Croix, Florida, here in Houston.

19   Q      Have you tried to add up the easily-captureable assets

20   in terms of planes and homes and real estate holdings owned

21   by Mr. Stanford?

22   A      I don't have a number for that, but it is in the

23   millions.

24   Q      Okay.  The TRO in this case was entered on

25   February 16th; is that right?

1  A      Yes, sir, it was signed by the Judge that Monday.

2  Q      And the raid at Stanford happened the following day,

3  February 17th, right?

4  A      The Receiver took over on the 17th.

5  Q      "The Receiver took over"; is that a nice way of

6  saying, when all those people come and sheet everything down

7  that that's when the Receiver took over?

8          **MR. PELLETIER:**  Objection, Your Honor, as to what

9  a "nice way" of saying --

10          **THE COURT:**  Sustained.

11 **BY MR. COGDELL:**

12 Q      Okay.  On the 20th of February, three days after the

13 Receiver took over, Special Agent, are you aware that once

14 again Ms. Holt voluntarily came to Houston and met with the

15 Receiver?

16 A      If that was last Friday, yes, she was here meeting with

17 the Receiver.

18 Q      I think that was Friday.

19 A      I think so.

20 Q      And how many hours did she spend with the Receiver on

21 that day, if you know?

22 A      I don't know.  I know she flew in that day and flew out

23 that day.

24 Q      Okay.  And was she accompanied by a different lawyer

25 than Mr. Sjoblom?

1   A    It's my understanding she was, yes, sir.

2   Q    And the different lawyer -- if I could have him stand

3   up.

4           MR. COGDELL:  Mr. Baker, would you stand?

5   BY MR. COGDELL:

6   Q    Can you see him, Special Agent?

7   A    No, sir, but I know who he is.

8   Q    Let me get him away from around the --

9           THE COURT:  Around the pole.

10          MR. COGDELL:  Around the pole.

11  BY MR. COGDELL:

12  Q    Can you see him now?

13  A    Yes, sir.

14  Q    Okay.  And that's Brent Baker, right?

15  A    Yes, sir.

16  Q    That is a different lawyer from Mr. Sjoblom, right?

17  A    Yes, sir, he is.

18  Q    Different firm.

19  A    Yes, sir.

20  Q    And as far as you know, Mr. Baker does not represent

21  Stanford through -- or Mr. Stanford or Mr. Davis or anyone

22  else that was at these meetings, correct?

23  A    As far as I know, yes, sir.

24  Q    Okay.  Likewise, with respect to this meeting here on

25  the 10th, is it true -- is it also true, Special Agent, that

1  Ms. Holt answered every question they asked of her?

2  A    I don't know that.  I was not present at those

3  meetings.

4  Q    Fair enough.  Did you receive any information from any

5  source that she refused to answer any question asked of her?

6  A    No, sir.

7  Q    Did you receive any information from any source that

8  she terminated the interview before the interview was

9  concluded?

10  A    No, sir.

11  Q    Did you receive any information from any source that

12  she refused to answer any questions based upon her privilege

13  against self-incrimination?

14  A    No, sir, she didn't.

15  Q    So as far as you are aware, she answered every question

16  put to her by anybody that was asking questions.

17  A    Yes, sir, she was cooperative.

18  Q    Now, are you aware once again, on the 25th, ma'am, that

19  there was a phone conference where Ms. Holt was questioned

20  by the Receiver for several hours via telephone?

21  A    Yes, sir.  And I think that was the correct date.  It

22  was this week.

23  Q    Okay.  If I suggested to you it was Wednesday --

24  A    Wednesday?  That's what I was thinking.

25  Q    Okay.  Once again, is it your understanding that this

1  conversation like the others had lasted several hours?

2  A    Yes, sir.

3  Q    And like the others, she answered every question put to

4  her and was completely cooperative as far as you know?

5  A    As far as I know, yes, sir.

6  Q    Now, yesterday, she was asked to come to Houston by the

7  Receiver to continue to answer questions put to her from the

8  Receiver, correct?

9         **MR. COGDELL:**  Can you see that, Your Honor, if --

10        **THE COURT:**  No, I can't see that.

11        **MR. COGDELL:**  Do you want me to move it?

12        **THE COURT:**  No -- yeah, why don't you --

13        **MR. COGDELL:**  Where do you want it?

14        **THE COURT:**  Right there.  Thank you, that's fine.

15        **MR. COGDELL:**  Okay.

16  **BY MR. COGDELL:**

17  Q    Yesterday, on the 26th -- I'm going to put

18  "cooperative" on the "25th"; that's true, correct?

19  A    Yes, sir.

20  Q    Yesterday, once again she came to Houston to answer any

21  questions put to her by the Receiver, right?

22  A    Yes, sir.

23  Q    And that was the situation we talked about where the

24  Receiver voluntarily advanced her $10,000 so she could get

25  here.

 1  A    Yes, sir.

 2  Q    And like the other occasions, for several hours,

 3  Ms. Holt answered, as far as you know, every single question

 4  put to her, right?

 5  A    Yes, sir.

 6  Q    And as far as you know, never refused to answer a

 7  question based upon the grounds it might incriminate her,

 8  ask for a lawyer to terminate her conversation or anything

 9  on the --

10  A    She had Mr. Baker with her --

11  Q    Right.

12  A    -- but she was cooperative, yes.

13  Q    Okay.  And when did this cooperative session with the

14  SEC end?

15  A    A little bit before 3:00 p.m.

16  Q    And where were you when the cooperative session ended?

17  A    We were waiting outside in the lobby.

18  Q    Gotta to ask who's "we"?

19  A    My partner, Special Agent Chad Nunez, and I and two

20  other special -- well, three other special agents.

21  Q    You had an arrest warrant.

22  A    Yes, sir, we did.

23  Q    And when had you obtained the arrest warrant for her?

24  A    Wednesday evening.

25  Q    Was the SEC aware that you had the arrest warrant?

AGENT VANESSA WALTHER -- CROSS BY MR. COGDELL                    54

1   A    They didn't know specifically that we had a warrant,

2   no, sir.

3   Q    Did you ever communicate to Mr. Baker or Ms. Holt

4   before she came here, "Oh, by the way, we have a little

5   surprise for you when you come to Houston"?

6   A    I never talked to them before they came to Houston.  As

7   a matter of fact, I'd never talked to them until yesterday

8   when we executed the warrant.

9   Q    Did anybody to your knowledge, Special Agent, give any

10  idea to Ms. Holt who had been cooperating on this date, on

11  this date, on this date, on that date --

12          MR. PELLETIER:  Does include 2/10?

13          THE COURT:  Yes.

14          MR. PELLETIER:  Okay.  I'm going to object.

15          THE COURT:  Oh, can you not see that?  I'm sorry.

16          MR. PELLETIER:  It's okay.  I saw -- I object to

17  the form of the question if it includes 2/10.

18          MR. COGDELL:  She -- your witness has already

19  answered that she was cooperative and answered every

20  question put to her and had never --

21          MR. PELLETIER:  I don't think she's been

22  "cooperative."

23          MR. COGDELL:  Okay.

24          THE COURT:  Well, the question -- that'll be

25  sustained.

1           Do me one favor though: point it so

2   Mr. Pelletier can see it because --

3           **MR. COGDELL:**  Sure.  I'm sorry, Judge, I --

4           **THE COURT:**  Thank you.

5               I didn't realize you couldn't see it.

6           **MR. COGDELL:**  Can you see it?

7           **MR. PELLETIER:**  Thank you, yeah.

8           **MR. COGDELL:**  Sorry about that.

9           **MR. PELLETIER:**  That's okay.

10  **BY MR. COGDELL:**

11  Q    Did anybody tell Ms. Holt or her civil SEC lawyer that

12  after they were done asking questions of her instead of

13  thanking her or appreciating her coming, they were going to

14  arrest her?

15  A    I can't speak to what other people told her.  The FBI

16  did not inform them prior to executing the warrant that she

17  would be arrested.

18  Q    Do you have any source from any knowledge -- or any

19  knowledge from any source rather, Special Agent, that either

20  Mr. Baker or Ms. Holt was aware?

21  A    I do not believe they were aware, no, sir.

22  Q    And, in fact, would you agree with me that both

23  Mr. Baker and Ms. Holt expressed tremendous and great shock

24  and surprise when -- about the time lunch was being brought

25  in, she was arrested?

AGENT VANESSA WALTHER -- CROSS BY MR. COGDELL                    56

1   A    Yes, sir, she was surprised.

2   Q    And, in fact, she was trembling very visible and

3   noticeably.

4   A    As would be expected of somebody being arrested.

5   Q    She's got a palsy, are you aware of that?

6            MR. PELLETIER:  Objection.

7            THE COURT:  She can answer.  Overruled.

8   **BY MR. COGDELL:**

9   Q    Are you --

10  A    I know what she has stated to me.  Ms. Pendergest

11  stated that to me, yes.

12  Q    Did you see her shaking very, very visibly yesterday

13  continuing and through the time that I got to the FBI

14  offices a couple hours after you arrested her?

15  A    Yes, sir.

16           MR. PELLETIER:  Objection.  Relevance?

17           THE COURT:  Sustained.

18  **BY MR. COGDELL:**

19  Q    What is scheduled on Monday; any court proceedings

20  scheduled on Monday?

21  A    Yes, sir.

22  Q    What?

23  A    The SEC has a hearing, I believe, to make the TRO/PI.

24  Q    And explain in a general way what you understand is

25  going to happen on Monday.

AGENT VANESSA WALTHER -- CROSS BY MR. COGDELL                    57

1    A    All that I'm aware of is: they're going to -- they may

2    be putting on testimony to make the Temporary Restraining

3    Order a permanent injunction, and potentially talking about

4    payment of attorney's fees.

5    Q    So if I've got the calendar aspect of it right,

6    Ms. Holt was taken into custody and arrested after she was

7    brought here on a of the SEC, I guess, really one working

8    day before the SEC has its hearing scheduled in Dallas.

9              MR. PELLETIER:  Objection to the form, Your Honor,

10   "While here at the request of the SEC."  I think that the

11   testimony was she was brought here at the request of

12   Receiver.

13             THE COURT:  Sustained.

14             MR. PELLETIER:  The Court Receiver.

15             MR. COGDELL:  Fair enough.  I'll rephrase.

16                  She was brought here at the request of the

17   Receiver.

18             THE WITNESS:  Yes, sir.

19   BY MR. COGDELL:

20   Q    And arrested one calendar day before the SEC has to put

21   on testimony in Dallas, one calendar working day before the

22   SEC has to put on testimony in Dallas, correct?

23   A    Yes, sir.

24   Q    That's a coincidence?

25   A    Yes, sir.

1  Q    And were her funds frozen?

2  A    I would believe that it was when the TRO was signed and

3  it was executed on the 17th of February.

4  Q    And as far as you know, are any and all accounts that

5  Ms. Holt has access to frozen?

6  A    Any accounts that the Receiver is aware of, yes, sir,

7  are frozen.

8  Q    Well, would you agree with me that the order is a very

9  broad order?

10  A    I haven't read the complete order.

11  Q    Okay.  This Credit Suisse account that Counsel referred

12  to you about, Special Agent, where she signed some documents

13  over or at the request of the SEC?

14  A    At the request of the Receiver, I believe, yes, sir.

15  Q    I'm sorry, I keep doing it.  My bad.

16              She signed documents at the request of the

17  Receiver concerning the Credit Suisse accounts, right?

18  A    Yes.

19  Q    And those accounts apparently had balances of a

20  significant amount like $160 million?

21  A    Yes, sir, that's my understanding.

22  Q    And would you agree with me, ma'am, that as a result of

23  executing those documents, at the request of the Receiver

24  and as a result of the orders entered by the District Judge

25  in Dallas, she has no access to those funds, right?

1   A    She signed over her access to accounts that the

2   Receiver was aware of, yes, sir.

3   Q    And where I'm going with you specifically, just so that

4   we're on the same page here, that's the $160 million account

5   that Counsel was asking you about in the Credit Suisse.

6   A    Yes, sir.

7   Q    And she signed that over yesterday?

8   A    Yes, sir.

9   Q    I assume it is safe to presume that she signed over the

10  $160 million accounts before she got arrested?

11  A    Yes, sir, she did.

12  Q    Okay.

13          MR. COGDELL:  Judge, it's about 10 till, if you

14  want to break now?

15          THE COURT:  Thank you.  Yeah, 1:45?

16          MR. COGDELL:  Yes, ma'am.

17          THE COURT:  All right.  See you back at 1:45.

18          MR. PELLETIER:  Thank you, Your Honor.

19          THE COURT:  The Court will stand in recess until

20  then.

21          (Recess taken from 11:46 a.m. to 1:46 p.m.)

22                    AFTER RECESS

23          THE COURT:  All right.  Mr. Cogdell, you were

24  questioning Ms. Walther.

25          MR. COGDELL:  I was, Your Honor.

1              May I proceed?

2          **THE COURT:**  Yeah.

3          **MR. COGDELL:**  First of all, Agent Walther, I'm

4  going to try to wrap up as quickly as I can.

5      **CROSS EXAMINATION OF AGENT VANESSA WALTHER (RESUMED)**

6  **BY MR. COGDELL:**

7  Q    When did Allen Stanford appear pursuant to the

8  subpoena from the -- of the SEC?

9  A    He did not.

10 Q    When did he voluntarily appear in front of the SEC?

11 A    He did not.

12 Q    When did he voluntarily meet with the Receiver?

13 A    He has not, to my knowledge.

14 Q    Has he signed over his signatory authority on any

15 accounts that you know of?

16 A    No, sir.

17 Q    I'm sorry?

18 A    Not that I know of.

19 Q    He's done nothing in terms of cooperation; would you

20 agree with me?

21 A    Yes, sir.

22 Q    Similarly to Mr. Davis, when did he appear pursuant to

23 a subpoena?

24 A    He did not.

25 Q    To be clear, was Stanford subpoenaed?

AGENT VANESSA WALTHER -- CROSS BY MR. COGDELL                    61

1  A      Yes, sir, he was.

2  Q      And likewise, Davis was subpoenaed?

3  A      Yes, sir.

4  Q      They just announced, I guess, through their lawyer

5  Mr. Sjoblom -- I'm horrible with names -- I guess it'd be

6  Mr. Sjoblom that told the SEC they were not going to appear?

7  A      I'm not sure of the exact -- but they had an agreement

8  that they were not going to appear, yes.

9  Q      Okay.  Did Davis ever voluntarily meet with the SEC?

10  A      Not that I'm aware of, no, sir.

11  Q      Meet with the Receiver?

12  A      No, sir.

13  Q      Sign over any accounts?

14  A      Not that I'm aware of, no, sir.

15  Q      Has he done anything that would come under the ambit

16  of "cooperation"?

17  A      No, he hasn't come forward.

18  Q      Do you know where Davis is?

19  A      At this moment?  No, sir, and I haven't looked for him

20  at this moment.

21  Q      Stanford, to your knowledge, is in the Virginia area

22  somewhere?

23  A      Yes, sir, to my knowledge.

24  Q      There is no warrant out for Stanford.

25  A      No, sir.

1    Q      No warrant out for Davis.

2           **MR. PELLETIER:**  Objection, Your Honor.

3           **THE COURT:**  Yes?

4           **MR. PELLETIER:**  Those who had, they were not

5    relevant to this proceeding.

6           **THE COURT:**  What's the relevance?

7           **MR. COGDELL:**  I'll move on.

8           **THE COURT:**  All right, thank you.

9    **BY MR. COGDELL:**

10   Q      I'm not asking for the identity, but did -- in terms

11   of general counsel, did general counsel for the Stanford

12   Group or the Stanford company every voluntarily appear at

13   the SEC?

14   A      For testimony?

15   Q      Yes, ma'am.

16   A      No, sir.

17   Q      CW-1, did they voluntarily appear for testimony?

18   A      For testimony?  No, sir.

19   Q      CW-2?

20   A      And I'm talking sworn testimony.

21   Q      Yes.

22   A      No, sir.

23   Q      CW-3?

24   A      No, sir.

25   Q      So all the people described either by name or by

1  description, if you will, a shorthand rendition description,

2  the only one that's appeared and given testimony is

3  Ms. Holt.

4  A    Yes, sir, she was put up as the person with knowledge

5  of the assets of the Bank.

6  Q    Okay.  She was put up through this lawyer hired by the

7  Stanford Group as the person with knowledge.

8  A    She was the person from Stanford Group that was to

9  have knowledge of that, yes.

10 Q    And the person -- to be specific, Special Agent, the

11 person that represented to you that Ms. Holt was the

12 individual with knowledge of Stanford was Stanford's

13 lawyer -- Stanford Group's lawyer.

14 A    He didn't represent that to me, no, sir.

15 Q    He represented that to somebody.

16 A    Yes, sir.

17 Q    Okay.  It's through him, Mr. Sjoblom, that she's

18 chosen to do that.

19 A    Not him alone, no, sir.

20 Q    Who else?

21 A    Other people that we interviewed.

22 Q    In terms of her appearing at the SEC?  That's the

23 question on the table.

24 A    Oh, no, sir.

25 Q    Just through that one.

AGENT VANESSA WALTHER -- CROSS BY MR. COGDELL                    64

1   A     Yes, sir, that's what I'm aware of.

2   Q     Ms. Holt, you are aware -- I mean, Special Agent, that

3   Ms. Holt has no criminal history as far as you're able to

4   tell?

5   A     Yes, sir.

6   Q     You're agreeing with me?

7   A     Yes, sir.

8   Q     Has anybody suggested to you that she has threatened

9   to flee?

10  A     No, sir.

11  Q     From any source?

12  A     No, sir.

13  Q     Has anybody suggested to you, from any source, that

14  she's a danger, a physical danger to anyone?

15  A     No, sir.

16  Q     This thumb drive that Counsel gave you some -- asked

17  you some questions about on your direct, where's the thumb

18  drive?

19  A     I don't know.

20  Q     What's your proof that she has it?

21  A     I don't have any proof that she has it.

22  Q     The computer that the thumb drive was place into,

23  where's that?

24  A     I don't know.

25  Q     What's your proof that she has it?


JUDICIAL TRANSCRIBERS OF TEXAS, INC.

1   A      I don't know that she has it.

2   Q      Do you have any proof that she does?

3   A      No, sir.

4   Q      Do you have any proof that it was her computer that

5   the thumb drive was placed into?

6   A      No, sir.

7   Q      Do you have any proof that it was her thumb drive that

8   was placed into the computer that you don't have any proof

9   was hers?

10  A      No, sir.

11              **MR. COGDELL:**  May I have just a minute,

12  Your Honor?

13              **THE COURT:**  Uh-huh.

14  **BY MR. COGDELL:**

15  Q      Are you aware of whether or not through your

16  investigation, Special Agent, that Davis was, for lack of a

17  better description, "a bit technologically challenged," that

18  he didn't work well with computers?

19  A      Yes, sir.

20  Q      Did it come to your attention that what Ms. Holt did

21  in terms of creating this pie chart was: take information

22  given to her by Mr. Davis and create, based on the

23  information that Davis gave to her, a pie chart?

24  A      Yes, sir.

25  Q      So your investigation is that she was simply relying

1   upon information given to her by Mr. Davis.  Because she was

2   a bit more technologically proficient than Mr. Davis, she

3   created this pie chart.

4   A    I can't say that that was the only information that

5   she was using but he was providing information to her.

6   Q    Is that consistent with your investigation?

7   A    I'm sorry, is what consistent?

8   Q    Sure.  Is my suggestion that she created this pie

9   chart based on information provided to her by Davis

10  consistent with your investigation?

11  A    It's consistent that Davis provided her information

12  that she used to make the pie chart.

13  Q    Fair enough.

14          **MR. COGDELL:**  May I approach, Your Honor?

15          **THE COURT:**  You may.

16  **BY MR. COGDELL:**

17  Q    Special Agent, I'm showing you three more pictures:

18  3, 4, and 5, and ask you if you seen the contents of those

19  photographs before?

20  A    I haven't seen these photographs but I have seen -- I

21  know what these are.

22  Q    Do the photographs, as far as you can tell, Special

23  Agent, clearly and accurately depict the contents that are

24  reflected therein?

25  A    Yes, sir, they do.

1   Q       And for the record, Defendant's Exhibit 3 appears to

2   be the house owned by Ms. Holt in Baldwyn, Mississippi.

3   A       Yes, sir.

4   Q       And likewise, Defendant's 4 and 5 appear to be

5   pictures of a house owned by Mr. Davis in Baldwyn,

6   Mississippi.

7   A       Yes, sir.

8           **MR. COGDELL:**  I'll tender 3, 4, and 5 to opposing

9   counsel, Your Honor.

10          **THE COURT:**  Any objection, Mr. Pelletier?

11          **MR. PELLETIER:**  None, Your Honor.

12          **THE COURT:**  All right.  Defendant's 3, 4, and 5

13  will be admitted.

14      **(Defendant's Exhibit Numbers 3, 4, and 5 were admitted**

15  **into evidence)**

16  **BY MR. COGDELL:**

17  Q     Do you have any proof that Ms. Holt has access to any

18  funds that aren't seized?

19  A     I know that she does not have access to any funds that

20  the Receiver is aware of the existence of the accounts.  If

21  the Receiver knows the existence of the account, she does

22  not have access.

23  Q       Do you know of any funds that she has access to that

24  the Receiver is not aware of?

25  A       No, sir, only she would know that.

1    Q      Okay.  What's your proof that she has accounts that

2    the Receiver is not aware of?

3    A      She was the Chief Investment Officer for

4    Stanford Financial Group.

5    Q      Again, I'll ask the question: except for her job

6    description, what's your proof that Ms. Holt has access to

7    funds unknown to the Receiver?

8              **MR. PELLETIER:**  It's asked and answered.

9              **THE COURT:**  Overruled.

10             **THE WITNESS:**  I don't have proof of other

11   accounts.  If we did, those accounts -- she would not have

12   access to.

13             **MR. COGDELL:**  I pass the witness, Your Honor.

14             **THE COURT:**  Mr. Pelletier.

15             **MR. PELLETIER:**  Yes, Your Honor.

16             **REDIRECT EXAMINATION OF AGENT VANESSA WALTHER**

17   BY MR. PELLETIER:

18   Q      You were asked questions about proof about whether or

19   not where the hard drive [sic] was that we talked about; do

20   you recall that?

21   A      Yes, sir.

22   Q      Who is the last person that your investigation

23   revealed was in possession of that hard drive [sic]?

24   A      The thumb drive, I assume, is what you're talking

25   about.

1  Q       Thumb drive.  I'm sorry, thumb drive.

2  A       Laura Pendergest was working on a computer that the

3  thumb drive was plugged into creating a spreadsheet.

4  Q       And you were asked questions about her access to

5  accounts that you knew, correct?

6  A       Yes, sir.

7  Q       The accounts that the Receiver knows about contain --

8  what is your understanding as to the amount of money that

9  the accounts that the Receiver knows about contain?

10 A       I know of the Credit Suisse account which is

11 160 million.  And then an additional 90 million but I don't

12 know what specific accounts those are in.

13 Q       So are you aware that the Receiver knows about any

14 other accounts with respect to any other sum of money in

15 there as proof of them?

16 A       No, sir, I don't have a detailed list of the accounts

17 that the Receiver's aware of.

18 Q       Do you know if the Receiver has been able to find

19 the approximately $6 billion that was represented to be

20 Tier III?

21 A       No, sir.

22 Q       I'm going to just show you the chart that was shown

23 and we talked about.  You were asked whether

24 Robert Stanford -- whether he appeared before the -- whether

25 he had been subpoenaed to the SEC, correct?

1   A      Yes, sir.

2   Q      Who is the person that you do know was subpoenaed?

3   A      Mr. Stanford was subpoenaed, Mr. Davis, and Ms. Holt.

4   Q      And anybody else?

5   A      I don't recall anyone other than those three.

6   Q      Is another person that was supposed to show up that

7   didn't on Monday, September 9th?

8   A      Oh, I'm sorry.  The President of the SIB Affiliate.

9   Q      And what is his name?

10  A      Juan Rodriguez-Tolentino.

11  Q      And what is your understanding after talking to the

12  confidential witnesses as to what the reason was he wouldn't

13  show up?

14  A      Because he could not answer the questions as to where

15  the assets of Tier III were.

16  Q      And then you talked about Jim Davis.  And you said

17  that it was his understanding that he did not appear for a

18  subpoena.

19  A      No, sir, he has not appeared before the SEC for

20  testimony.

21  Q      For testimony.  And the charges that you're aware of,

22  the 1505, are they a result of the appearance before the SEC

23  staff?

24  A      They're a result of the testimony that was given to

25  the SEC.

1  Q      Any nobody else gave testimony as far as you know in

2  this case.

3  A      No, sir.

4  Q      Okay.  And then he asked you whether or not she --

5  Mr. Stanford had voluntarily appeared at the SEC, correct?

6  A      Yes, sir.

7  Q      And he asked you whether Jim Davis voluntarily

8  appeared before the SEC, correct?

9  A      Yes, sir.

10 Q      I'm going to ask you refer to the last paragraph of

11 the affidavit if you have it in front of you.

12 A      Yes, sir, I do.

13 Q      Did Ms. Pendergest-Holt speak with the SEC about

14 Tier III independent of the SEC testimony?

15 A      Yes, sir, she did.

16 Q      What did she tell them about Tier III?

17 A      "If I knew anything about Tier III, I'd tell you,

18         God's honest truth."

19 Q      Now, as it relates to the next thing, which is:

20 "voluntarily meet with the Receiver"; do you see that on the

21 board?

22 A      Yes, sir.

23 Q      And you said that neither Mr. Stanford or Mr. Davis

24 voluntarily appeared before the Receiver, correct?

25 A      Not that I'm aware of, sir.

1    Q     All right.  And when she did, you were asked about

2    questions about whether or not she answered questions.

3    A     Yes, sir.

4    Q     And you said that she did.

5    A     Yes, she did.

6    Q     And whether or not she had signed over accounts at

7    Credit Suisse that contained approximately 100-and-something

8    million dollars, correct?

9    A     Yes, sir.

10   Q     And did she provide -- you've spoken with the Receiver

11   about this, right?

12   A     Yes, sir.

13   Q     Did she provide them the names of those accounts and

14   talk about the existence of those accounts or did they

15   provide that information to her?

16   A     It's my understanding that they provided that

17   information to her.

18   Q     So she didn't volunteer, in your understanding, where

19   these Swiss banks; is that correct?

20          MR. COGDELL:  I'm sorry, it is his witness'

21   legal --

22          THE COURT:  Sustained.

23   BY MR. PELLETIER:

24   Q     Did she volunteer, to your understanding, the names

25   and locations of these accounts to the Receiver?

1  A     The Receiver was aware of them prior to talking to

2  her.

3  Q     Okay.  And asked her to sign them over.

4               And did she?

5  A     Yes, sir, she did.

6  Q     All right.  Now, let's -- and then we talked about

7  Zurich, Switzerland; do you remember that?

8  A     Yes, sir.

9  Q     I'm going to show you what's been marked as

10 "Government Exhibit Number 2" for the purpose of this

11 hearing.  It is the passport of Robert Allen Stanford.

12              I'll ask you if you recognize it.

13         **MR. COGDELL:**  She doesn't -- oh, you have a copy,

14 I'm sorry.

15         **THE WITNESS:**  No, sir, I don't have a copy.

16         **MR. PELLETIER:**  She doesn't, I'm sorry.

17         **MR. COGDELL:**  That's okay.

18 **BY MR. PELLETIER:**

19 Q     And while he's looking at that, in terms of

20 volunteering, has -- is it your testimony or do you know

21 whether or not Ms. Pendergest-Holt has volunteered the

22 location of that thumb drive that we talked about earlier?

23 A     No, sir, she has not.

24 Q     I'm going to show you the passport of Robert Allen

25 Stanford.

AGENT VANESSA WALTHER -- REDIRECT BY MR. PELLETIER                 74

1              And you were asked about whether or not

2  Switzerland will stamp your passport, correct?

3  A     Yes, sir.

4  Q     I'm going to ask you look -- I've marked two places:

5  one January 26th, 2009; the other January 28th, 2009.

6              Can you tell us where Mr. Robert Allen

7  Stanford was on January 26th, 2009?

8              MR. COGDELL:  Objection.  Hearsay, Your Honor.

9  BY MR. PELLETIER:

10  Q     What does the passport say?

11             MR. PELLETIER:  I'm sorry, withdraw that

12  question.

13             MR. COGDELL:  The passport, I'm sorry.

14             THE COURT:  Has the passport been offered?

15             MR. COGDELL:  No, that's my objection.

16             MR. PELLETIER:  Oh, may I -- I'm sorry -- may I

17  offer Mr. Stanford's passport?

18             THE COURT:  And the relevance of Mr. Stanford's

19  passport would be?

20             MR. PELLETIER:  I will link it up that there are

21  stamps to Zurich and the witness can testify she had not

22  seen the stamp for Switzerland before and there are some --

23             THE COURT:  Any objection to the passport?

24             MR. COGDELL:  No.

25             THE COURT:  All right.  The passport will be

AGENT VANESSA WALTHER -- REDIRECT BY MR. PELLETIER                    75

1   admitted, or the copy of the passport, I think.

2                       That's Government's Number 2?

3            **MR. PELLETIER:**  Yes, Your Honor.

4        **(Government's Exhibit Number 2 was admitted into**

5   **evidence)**

6            **THE COURT:**  Did the Government ever -- did you

7   ever offer Number 1, Mr. Pelletier?

8            **MR. PELLETIER:**  I offer Number 1.

9            **THE COURT:**  All right.  Any objection to

10  Number 1?

11           **MR. COGDELL:**  Well, I'm objecting now for sure.

12       **(Laughter)**

13                  No, no objections, Your Honor.

14           **THE COURT:**  All right.  Number 1 will be

15  admitted.

16       **(Government's Exhibit Number 1 was admitted into**

17  **evidence)**

18                  And was Number 1 Ms. Holt's passport --

19           **MR. PELLETIER:**  It was, Your Honor.

20           **THE COURT:**  -- or a copy of it?

21           **MR. PELLETIER:**  It was a copy of it.  All right.

22  **BY MR. PELLETIER:**

23  Q    Robert Allen Stanford, what does his passport say as

24  it relates to January 26th, 2009?

25  A    It's showing a stamp from Zurich.

1   Q      Zurich is in?

2   A      Switzerland.

3   Q      Okay.  And what does it say in terms of departure

4   1/28/09?

5   A      There's a Zurich stamp.

6   Q      All right.  Zurich is in?

7   A      Switzerland.

8   Q      What does -- oh, what does the passport, which is

9   Government's Exhibit 1 for the purpose of this hearing, show

10  as to Ms. Pendergest-Holt's whereabouts on the 26th and 28th

11  of '09?

12  A      It doesn't show anything on the 26th or 28th.

13  Q      Does it show anything on the 29th?

14  A      Yes, sir, it does.

15  Q      And what does it show on the 29th?

16  A      It shows an exit from Antigua.

17  Q      What does the passport say -- what does the stamp on

18  the passport that indicates the day she arrived in Antigua?

19  A      There is no entry stamp.

20  Q      Would you check it again please?

21  A      I'm sorry, what day am I looking for?

22  Q      Any arrival into Antigua in January of '09.

23  A      Is it okay if I look at the actual original passport?

24  Q      Yes.

25  A      All that I see for 2009 is the exit stamp for Antigua.

1  Q      There is no entry stamp is there that you can see.

2  A      No, sir.

3  Q      And is there an entry stamp for Antigua for when -- by

4  the way, do you know how -- from your investigation, how

5  Mr. Stanford travels around foreign countries?

6  A      Corporate private aircraft.

7  Q      Is there an entry stamp for him in Antigua after he

8  leaves Switzerland?

9  A      No, sir, I do not believe so.

10 Q      Now, I'm going to ask you to look at Mr. Davis'

11 passport which I'm going to give to you as "Government's

12 Exhibit" -- I believe it would be Government's Exhibit

13 Number 3; do you recognize this?

14 A      Yes, sir, I do.

15         **MR. PELLETIER:**  Your Honor, I'd move in

16 Government's Exhibit Number 3.

17         **THE COURT:**  Any objection, Mr. Cogdell?

18         **MR. COGDELL:**  No objections.

19         **THE COURT:**  All right.  Number 3 will be

20 admitted.

21     **(Government's Exhibit Number 3 was admitted into**

22 **evidence)**

23 **BY MR. PELLETIER:**

24 Q      Where is Mr. Davis, according to the passport stamps,

25 in January of '09?

1            Specifically, does he ever enter and exit

2   Antigua and are there stamps that reflect both entry and

3   exit?

4   A     Yes.

5            **MR. COGDELL:**  I'm sorry, relevancy at this point

6   as to where Davis is in January.

7            **THE COURT:**  What's the relevance?

8            **MR. PELLETIER:**  The point has been made earlier

9   that she has been to Switzerland and the passport does not

10  reflect stamps into Switzerland.

11           **MR. COGDELL:**  Actually, that's not correct.  He

12  made the point that she's been to Switzerland, not me.

13           **THE COURT:**  But the point was made.

14           **MR. COGDELL:**  Yeah.

15           **THE COURT:**  Go ahead.

16           **MR. PELLETIER:**  And that Switzerland -- the point

17  was also attempted to be made that Switzerland does not

18  stamp one's passport.

19           **THE COURT:**  Okay.

20           **MR. PELLETIER:**  We have Mr. Stanford in

21  Switzerland stamped the 26th and 28th --

22           **THE COURT:**  Right.

23           **MR. PELLETIER:**  -- and no entry into Antigua.

24            We have Ms. Pendergest-Holt exiting from

25  Antigua but no entry.  Also, no entry into Antigua.

1          We have Mr. Davis in Antigua both an entry

2    and an exit stamp.  On January 21st enter, and January 29th

3    exit.  He exits with her from Antigua.

4          We have previously put in evidence to show

5    that on the 27th they had agreed that she was going to be

6    the one to testify about the Tier III assets.

7          We also have established, we believe, that

8    she has access or she should or could have access to Swiss

9    bank accounts which we do not know about and that there

10   are --

11        **THE COURT:**  And so what's Mr. Davis -- have you

12   already given your proffer testifying basically,

13   Mr. Pelletier, about what you wanted the witness to say?

14        **MR. PELLETIER:**  I don't want the witness to say

15   anything but what's in the passport.

16        **THE COURT:**  All right.  Okay.

17          You can testify as to what's in the passport

18   if you find it.

19        **MR. COGDELL:**  Just for the record, renew my

20   objection as to the relevancy on the Davis passport.

21        **THE COURT:**  All right, I understand.

22        **THE WITNESS:**  There is an entry stamp dated

23   January 21st, 2009 on Mr. Davis' passport, and an exit stamp

24   from Antigua on January 29th.  So entry on the 21st, exit on

25   the 29th from Antigua by Mr. Davis.

1          **MR. PELLETIER:**  Okay, thank you.

2               I have, I think, one more question,

3   Your Honor.

4       **(Pause)**

5               I believe I've covered everything.  If you'd

6   give me just one minute?

7          **THE COURT:**  Sure.

8          **MR. PELLETIER:**  That's all I have for this

9   witness, Your Honor.

10         **THE COURT:**  All right.

11         **MR. PELLETIER:**  And that's all I have for -- by

12  way of presentation.

13         **MR. COGDELL:**  Briefly.

14         **THE COURT:**  Briefly?  All right, briefly.  I

15  trust you will.

16      **(Laughter)**

17        **RECROSS EXAMINATION OF AGENT VANESSA WALTHER**

18  **BY MR. COGDELL:**

19  Q    We've had a back and forth on Switzerland and no

20  Switzerland with respect to Ms. Holt, passport stamp, no

21  passport stamp to Switzerland with respect to Ms. Holt; you

22  with me so far?

23  A    Yes, sir.

24  Q    What's your proof -- Special Agent, what's your proof

25  that Ms. Holt was in Switzerland in January?

AGENT VANESSA WALTHER -- RECROSS BY MR. COGDELL                     81

1          **MR. PELLETIER:**  Objection, unless we're talking

2    about circumstantial or direct.

3          **MR. COGDELL:**  Well, he's the one that put it in.

4          **THE COURT:**  Yeah.

5                Does she have any proof?

6    **BY MR. COGDELL:**

7    Q    What's your proof that she went to Switzerland?

8    A    It's my understanding that she made a statement to

9    Pretrial Services that she'd been to Switzerland, yes.

10         **MR. COGDELL:**  May I approach, Your Honor?

11         **THE COURT:**  You may.

12   **BY MR. COGDELL:**

13   Q    Have you seen --

14         **THE COURT:**  Although that's confidential, that's

15   not for the agent's perusal.

16         **MR. COGDELL:**  Okay.

17   **BY MR. COGDELL:**

18   Q    Have you seen what's in the pretrial services report?

19   A    Oh, no, sir.

20   Q    Okay.

21   A    I was asked the question.

22   Q    All right.  So you are basing your whole -- you are

23   basing your belief that she went into Switzerland on a

24   pretrial services report that you've never -- that she went

25   into Switzerland this year in January on a pretrial services

report that you've never seen.

A Oh, no, sir. I'm not -- I don't know that she went to Switzerland in January. I'm not saying that at all. There is no stamp in her passport.

Q Okay. So would you agree with me that you have no proof whatsoever and you are not trying to suggest that she was in Switzerland in January of this year?

Do you agree with both of those things?

A I'm not trying -- to answer your first question do I have any proof --

Q Uh-huh.

A -- that she'd been to Switzerland in January?

Q In January of this year.

A No, sir, I do not.

Q Are you suggesting that she went to Switzerland in January of this year?

A No, sir, I don't have a basis for that.

Q Where is Ms. Holt's passport now?

A It's right here.

Q You have it.

A Yes, sir.

Q She does not.

A No, sir.

Q She can't get it back unless the Court gives it back which I'm not going to ask for.

1                    She can't get that passport back, right?

2    A     No, sir, she can't.

3    Q     Do you have any proof from any source that she has

4    another passport?

5    A     No, sir.

6    Q     Do you have any proof -- this has been covered before

7    and I apologize, but do you have any proof that Ms. Holt has

8    access to a Swiss bank account currently?

9    A     No, sir, I do not.

10              **MR. COGDELL:**  I pass the witness, Your Honor.

11              **THE COURT:**  Mr. Pelletier, anything else?

12              **MR. PELLETIER:**  Just briefly.

13      **FURTHER REDIRECT EXAMINATION OF AGENT VANESSA WALTHER**

14   **BY MR. PELLETIER:**

15   Q     Do you know where Ms. Holt was and how she got into

16   Antigua without a stamp in January of '09; do you have any

17   proof?

18              **MR. COGDELL:**  Compound, Judge.

19              **THE COURT:**  Sustained.

20   **BY MR. PELLETIER:**

21   Q     Do you know where she was prior to entering Antigua

22   January 29th, 2009?

23   A     I know at a point where she was, yes, prior to

24   entering Antigua.

25   Q     Do you know when she arrived in Antigua?

1   A      No, sir.

2   Q      Do you know how she got to Antigua?

3   A      No, sir.

4   Q      Is there a stamp in her passport which says how she

5   got there?

6   A      No, sir.

7   Q      Is there a stamp in Mr. Stanford's passport of how he

8   got there?

9           **MR. COGDELL:**  Judge, this has been asked and

10  answered.

11          **THE COURT:**  Sustained.

12          **MR. COGDELL:**  It was covered by recross.

13          **THE COURT:**  Sustained.

14          **MR. PELLETIER:**  All right.

15  **BY MR. PELLETIER:**

16  Q      With respect to the second question in terms of proof,

17  do you know whether or not she has indeed access to Swiss

18  bank accounts?

19  A      She has -- she had access to the accounts that the

20  Receiver was aware of.  I don't know what other accounts she

21  may or may not have access to.

22  Q      Have you been able to get the records from Switzerland

23  to prove that she has no further access to any other Swiss

24  bank account other than the one somebody happened to tell

25  the Receiver about?

1          **MR. COGDELL:**  Judge, that assumes facts not in

2   evidence.

3          **THE COURT:**  Sustained.

4          **MR. PELLETIER:**  No further questions.

5          **THE COURT:**  All right.  You may step down,

6   Ms. Walther.

7      **(Witness Steps Down)**

8              You said you had no further witnesses,

9   Mr. Pelletier?

10         **MR. PELLETIER:**  I have no --

11         **THE COURT:**  Any witnesses, Mr. Cogdell?

12         **MR. COGDELL:**  We do not, Your Honor.

13         **THE COURT:**  All right.  I'm asking Pretrial to

14   verify something for me.

15     **(Pause/Court confers with Pretrial Officer)**

16              All right.  Any argument?  Okay.

17              There's an addendum on property that's on

18   its way up.

19         **MR. PELLETIER:**  Okay, very good.

20              Just briefly, Your Honor, may I be heard?

21         **THE COURT:**  Yeah.

22         **MR. PELLETIER:**  Your Honor, the point in asking

23   for this high bond is because this defendant who has been

24   purported to have -- by Stanford to be both the

25   investment -- the Chief Investment Officer who has been told

1    to the SEC has knowledge of Tier III indeed presented and

2    prepared a pie chart with the assistance of Mr. Davis as to

3    the existence of Tier III and what was in Tier III, a person

4    who when the Receiver brought to her attention a Swiss bank

5    account that was under her control and that she had not

6    volunteered to the Receiver with over $100 million in it,

7    only then did she agree to sign over the account.

8                    This is a woman who travels, appears in

9    countries with no way of verifying how she got there but we

10   know when she left there.  This is a woman who is the -- one

11   of three people who have access information about the

12   $6 billon that is now missing that belongs to investors.  I

13   can't tell the Court just as the agent can't tell the Court

14   where -- whether those accounts actually have her name on it

15   or don't have her name on it, but one thing is for sure,

16   when we found one account, it did have her name on it.

17                   She has been to Switzerland.  There is no

18   record in her passport of those trips to Switzerland.  She

19   clearly had control of at least one account in Switzerland

20   that she did not volunteer to the Receiver.  There are

21   billions of dollars missing in this case, Your Honor, and

22   this woman has a number of assets in real estate, she has a

23   number of properties, she's being paid a million dollars a

24   year.

25                   And most importantly, she indeed had the

JUDICIAL TRANSCRIBERS OF TEXAS, INC.

1  thumb drive in her possession.  It was never volunteered to

2  anybody what happened to that after it left her possession.

3  That had information that could have been used and still can

4  be used by the Receiver to help the investors recover their

5  money.

6            I cannot in good conscious rely upon the

7  fact that we can't prove where the money is to somehow

8  eliminate that as a flight risk for this individual.  That

9  is why we've asked for $1 million cash bond or surety and

10 electronic monitoring.  This is serious, this is a serious

11 case.

12           She is the only one who testified for the

13 SEC.  She's the only one who can be charged with obstruction

14 during that proceeding.  So the fact that there might be

15 other people out there who may also have access to the money

16 should not affect the Court's judgment of what this woman

17 has access to and has proved to have -- and we have proved

18 to have access to.

19           I have nothing further, Your Honor.

20           **THE COURT:**  All right.  Thank you, Mr. Pelletier.

21           Mr. Cogdell?

22      **MR. COGDELL:**  It's interesting because for the

23 past two or three hours we keep hearing the phrase,

24 "Billions of dollars, billions of dollars."  That doesn't

25 change anything.  There's no proof that she's a serious risk

1   of flight.  The Court knows the statute better than I do.

2   The Government has to prove serious risk of flight.  They

3   have to prove or justify in some shape, form, or fashion,

4   Judge.  I recognize they're not seeking detention but they

5   have to justify a million dollar bond that they're asking

6   for.  This is not my first rodeo.  I have been in a bunch of

7   trials over here.  I've never had the Government ever ask

8   for a million dollar bond.

9           Their proof that she has access to those

10  funds is zero.  Their proof that she didn't cooperate with

11  the SEC save and except this complaint suggestion is zero.

12  This proof that she's got access to fly away is zero.  The

13  proof that she's got money hidden or secreted away is zero.

14  The proof that she's supposedly has access to hidden or

15  unknown Swiss accounts is zero.

16          With all due respect, the Government, this

17  Government, and the Securities and Exchange Commission are

18  talking out of two different mouths.  Yesterday, as in

19  24 hours ago, the SEC gave her through her lawyer $10,000

20  because she had no access to funds to get here to come here

21  to continue to cooperate.  She's arrested, and less than 24

22  hours later, we have this suggestion -- and honestly that's

23  all it is is a suggestion that she has millions of dollars

24  tucked away somewhere.

25          Pretrial does this for a living.  They know

1  what they're doing.  They have followed -- they've

2  interviewed the right people, they've reviewed the right

3  assets and I suggest to you quite simply, Judge, that the

4  bond that they propose is a fair one considering these

5  factors.

6                This is a complaint.  It's not even an

7  indictment.  It's a five-year exposure.  I don't like

8  exposure.  And the federal round makes it a relatively small

9  exposure.  She voluntarily met with the Receiver multiple

10  times.  You know the purpose of a bond is to assure their

11  appearance in court, not to try to extract supposedly thumb

12  drives that they don't have any proof that she has or

13  computers that she -- no proof that she has to get back to

14  them.

15                She relinquished control of 168 million.  We

16  hear on and on about how she didn't volunteer about the

17  accounts.  I suspect it's in this Court's common knowledge

18  the first thing a lawyer tells a client to do is: "Don't

19  volunteer.  Ask the question -- or answer the questions that

20  are asked of you."  She answered every question put to her.

21  She's got no access to any funds known to the FBI.

22                She's the only target.  She's the only

23  person named in the SEC civil complaint to so cooperate.

24  She's the only one to meet with the Receiver.  She has no

25  criminal history.  There's no risk of flight.  There's no

1   suggestion of danger to me.  The fact that they are asking

2   for a million dollar bond is honestly an outrage given the

3   absence of proof.

4                     I suggest to you that the bond that Pretrial

5   suggested is appropriate.  I leave it to the Court.

6          **THE COURT:**  Mr. Pelletier, you have the

7   opportunity to reply if you choose but I don't think I need

8   to hear --

9          **MR. PELLETIER:**  I've made my point.

10         **THE COURT:**  All right.  Thank you so much.

11                    It's a serious case, there's no question

12  about it, in regard to the funds that are purportedly

13  missing.  The purpose of bail is to reasonably make --

14  reasonably assure that the defendant will appear for trial.

15  I think the Government's request is too high, Pretrial's is

16  too low.

17                    I'm going to release you on a $300,000 bond.

18  Ten percent of that must be deposited to the Registry of the

19  Court.

20                    You're to be under GPS monitoring.

21                    You are not to commit any violations of

22  local, state, or federal law.

23                    Your passport and your husband's passport

24  will be surrendered.

25                    You are under an obligation to make all

1    court appearances in connection with the case.   That

2    includes appearances to your pretrial services officer and a

3    promise to surrender to the prison authorities should you be

4    found guilty of this offense, and prison time being made a

5    part of the punishment in the case.

6               While you're on conditions of release, you

7    are not to do anything that would be seen as an attempt to

8    interfere with the Government's investigation, to obstruct

9    justice, to tamper with a witness, to retaliate against

10   someone for giving information to the Government.   If you

11   did any of those things, I will revoke your bond and you

12   will sit in custody awaiting trial in this matter.

13               You have property in North Carolina.

14               You have two properties in North Carolina,

15   you have two properties in Mississippi; is that correct?

16          **THE DEFENDANT:**  Yes, ma'am.

17          **THE COURT:**  You are not to take any steps to

18   sell, trade, lease, share, do anything with those

19   properties.

20               Is your husband here today?

21          **THE DEFENDANT:**  Yes.

22          **MR. COGDELL:**  He is.

23          **THE COURT:**  All right.  I've already said I need

24   his passport, correct?

25          **MR. COGDELL:**  You -- I don't know if you had --

1  if you've said it.  He doesn't have it with him.  I'll get

2  it FedExed.

3            THE COURT:  I need the passport surrendered --

4  your husband's passport surrendered by 12:00 o'clock Monday

5  afternoon.

6            Your passport is already in custody,

7  correct?

8            THE DEFENDANT:  Yes, ma'am.

9            THE COURT:  All right.  Do you have any firearms,

10  any weapons --

11            THE DEFENDANT:  None.

12            THE COURT:  -- anything like that?

13            THE DEFENDANT:  No.

14            THE COURT:  You're not to have any firearms while

15  this case is being prepared for trial.

16            You will be under the supervision of the

17  Pretrial Services Agency in --

18            PRETRIAL SERVICES OFFICER:  Mississippi.

19            THE COURT:  Mississippi is a big state.

20        (Laughter)

21            Tupelo?

22        MR. SPEAKER:  Tupelo.

23            PRETRIAL SERVICES OFFICER:  Tupelo, yes.

24            THE COURT:  In Tupelo?

25            MR. SPEAKER:  The (indiscernible).  That's --

1          **THE COURT:**  Well, I know that.

2          **MR. SPEAKER:**  Everybody.

3          **THE COURT:**  But that doesn't --

4          **PRETRIAL SERVICES OFFICER:**  We've alerted that

5    office.

6          **THE COURT:**  To that pretrial office?  All right.

7          **PRETRIAL SERVICES OFFICER:**  Yes, ma'am.

8          **THE COURT:**  The GPS is to be accessed immediately

9    upon your release from custody.

10               Will that be from this building,

11   Mr. Pelletier?

12         **THE MARSHAL:**  Yes, Your Honor, she'll be released

13   from here.

14         **MR. COGDELL:**  Well, finish your admonitions and I

15   have a couple of requests to make because she doesn't have

16   30,000 today to post so if you could -- if the Court

17   wouldn't mind to allow me to make a request after you're

18   done with the admonishments.

19         **THE COURT:**  Well, let's here this request.

20         **MR. COGDELL:**  Two requests:

21               Number one, if the husband could surrender

22   his passport in Tupelo --

23         **THE COURT:**  He can do that.

24         **MR. COGDELL:**  -- as opposed to appear.

25         **THE COURT:**  He can do that.

1      **MR. COGDELL:**  Second, because of the funds

2  situation, we have 10,000 available for her to post bond

3  here, and I believe through her husband's family he can

4  raise the additional 20,000.

5              But can she be released here on the 10,000

6  with the requirement that within 48 hours or by Tuesday at

7  5:00 o'clock that the additional 20,000 is posted in Tupelo?

8      **THE COURT:**  No, let's get it all posted.  They

9  can post it in Tupelo though.  They don't have to post it

10  all here.  Ten thousand can be posted here and 20,000 can be

11  posted in Tupelo.  That's going to be a hassle for the

12  Clerk's Office but I think it's doable.

13      **MR. COGDELL:**  Well, if she's going to be held in

14  custody then, are you refusing or not willing to go along

15  with the --

16      **THE COURT:**  I'm not willing to go along with that

17  request.

18      **MR. COGDELL:**  Okay.

19      **THE COURT:**  It's a more polite way of putting it.

20      **(Laughter)**

21      **MR. COGDELL:**  Sorry, sorry.  I slept exactly one

22  hour last night.  I'm a little tired, I'm sorry.

23              If you'll give me a few minutes to talk to

24  the family, I may just have them bring the money here as

25  opposed to bifurcating it or --

1      **THE COURT:**  Fine, that would be better for the

2  Clerk's Office, believe me.

3      **MR. COGDELL:**  Okay.

4      **THE COURT:**  Anything further, Ms. Brandt

5  (sp.ph.)?

6      **PRETRIAL SERVICES OFFICER:**  Are we addressing

7  employment, and what the travel will be?

8      **THE COURT:**  And you do need employment whether

9  it's wrapping hamburgers or what.  You're not going to be

10  employed in any financial entity at all so you need some

11  kind of employment.  I'll give you 10 working days to find

12  employment -- 10 working days from the time that you're

13  released from custody since I'm uncertain as to when that

14  will be.

15      **THE DEFENDANT:**  Yes, ma'am.

16      **THE COURT:**  But I do want you employed in some

17  capacity.  And that's verifiable employment, not installing

18  cables or doing car detailing or landscaping.

19      **MR. COGDELL:**  You were reading quickly.  I think

20  that Pretrial suggested that she will be able to come to the

21  Southern District to meet with me as well as the Northern

22  District or court appearances.  If that wasn't delineated, I

23  would request that so I won't have to go to Dallas every

24  time to meet her.

25      **THE COURT:**  Here's the only problem: will GPS

1   accommodate that since we're talking about airports and --

2          **PRETRIAL SERVICES OFFICER:**  It will if we don't

3   make it inclusive to that, but I'm waiting on your order for

4   that.  And if -- do you want her hooked up here in Houston

5   to travel to Mississippi or --

6          **THE COURT:**  Yes.

7          **PRETRIAL SERVICES OFFICER:**  Yeah.

8          **THE COURT:**  Yes, she's going to be hooked up

9   immediately.

10         **PRETRIAL SERVICES OFFICER:**  We can make that

11  happen.

12         **THE COURT:**  You can make it happen?

13         **PRETRIAL SERVICES OFFICER:**  Uh-huh.

14         **THE COURT:**  All right.

15         **MR. COGDELL:**  So that request we will be --

16         **THE COURT:**  Mr. Pelletier?

17         **MR. PELLETIER:**  Yes, Your Honor, just briefly.

18         **THE COURT:**  Sure.

19         **MR. PELLETIER:**  Would that -- would you also

20  include other standard conditions that are set forth in the

21  pretrial services report, specifically not speaking with

22  witnesses and things like that?

23         **THE COURT:**  Yes.  I meant to cover that in --

24  well, I did cover that in terms of any obstruction of

25  justice or tampering with witnesses.

JUDICIAL TRANSCRIBERS OF TEXAS, INC.

1                        But I'll tell you more specifically to have

2    no contact with anyone who is involved in any of these

3    entities that are detailed in the complaint.  There may be

4    other entities that are involved as well.  Have no contact

5    with them at all.  There may be occasions on which your

6    lawyers may want to speak with witnesses.  If you're in your

7    lawyers' presence you may do so or in the presence of

8    lawyers for the Government, but do not meet with any persons

9    who have any connection to this case at all without your

10   lawyers being present; is that clear?

11              **THE DEFENDANT:**  Yes, ma'am.

12              **THE COURT:**  All right.  Are there any specific

13   names that Ms. Holt should be --

14              **MR. COGDELL:**  We're going to stay away from the

15   complaint that --

16              **MR. PELLETIER:**  Well, I think the Court's order

17   was specific enough.

18              **THE COURT:**  All right.  Okay.  If there's nothing

19   further then, Ms. McBroom will reduce these to writing and

20   have you sign and swear to these conditions of release.

21                   Mr. Holt is going to be a cosurety on the

22   bond?

23              **MR. COGDELL:**  Yes, ma'am.

24              **THE COURT:**  And so he needs to sign and swear to

25   them as well.

1          **MR. COGDELL:**  He's here.

2          **THE COURT:**  And his passport -- you'll have till

3   Monday at noon.

4          **MR. COGDELL:**  Thank you.

5          **THE COURT:**  Okay.  All right.  The Court will

6   stand in recess.

7          **MR. COGDELL:**  Thank you for your patience,

8   Your Honor.

9          **MR. PELLETIER:**  Thank you, Your Honor.

10         **THE DEFENDANT:**  Ma'am, I have one question.

11      **(Defendant confers with Counsel)**

12         **THE COURT:**  Mr. Cogdell?

13         **MR. COGDELL:**  Just to be specific and plain, the

14   lot in North Carolina --

15      **(Counsel confers with Defendant)**

16             It was already put on the market in January

17   before the Receiver's freeze and before this Court's order.

18   I'm not going to ask you to vitiate your order.  I just want

19   you to be aware that -- just want you to be aware that it's

20   on the market now.  I don't think she can, given my limited

21   understanding of the freeze order from the --

22         **THE COURT:**  You may not be able to.

23             But what do you know about that,

24   Mr. Pelletier?

25         **MR. PELLETIER:**  I don't know anything about that.

JUDICIAL TRANSCRIBERS OF TEXAS, INC.

1          But I do know that the Receiver is probably

2   the appropriate person to talk to about -- if the Court

3   wants us to find out about how he's handling it.  I think to

4   some degree most of that property is de facto under his

5   control.

6          THE COURT:  Okay.  So long as it's under the

7   Receiver's control, I'm happy just so long as the Holt's

8   don't have access to it before --

9          MR. PELLETIER:  I hear you.

10          THE COURT:  Okay.

11          MR. COGDELL:  I just didn't -- she didn't want

12   the Court to be surprised by finding out that someone --

13          THE COURT:  Thank you.  All right.  Okay, thank

14   you.  The Court will stand in recess.

15          MR. PELLETIER:  Thank you, Your Honor.

16          THE COURT:  Thank you.  Oh, and as an addendum,

17   gentlemen, I did have Pretrial just clarify what the

18   property was because it was unclear from the original report

19   so --

20          MR. COGDELL:  Thank you, ma'am.

21          MR. PELLETIER:  Thank you.

22          THE COURT:  Thank you.

23          **(This proceeding was concluded at 2:29 p.m.)**

24

25                          **\* \* \* \* \***

1  *I certify that the foregoing is a correct transcript from*

2  *the electronic sound recording of the proceedings in the*

3  *above-entitled matter.*

4  */s lmartin*

5  _____

6  *JUDICIAL TRANSCRIBERS OF TEXAS, INC.*

7  *JTT JOB/INVOICE # 27579: 85-89*

8  *DATE:  JUNE 10, 2009*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25